**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| THE STATE OF TEXAS;<br>TEXAS COMMISSION ON<br>ENVIRONMENTAL<br>   QUALITY;<br>TEXAS GENERAL LAND OFFICE; and<br>TEXAS PARKS AND WILDLIFE<br>DEPARTMENT;<br><br>       Plaintiffs,<br><br>  v.<br><br>3M COMPANY;<br>AGC CHEMICALS AMERICAS, INC.;<br>ARCHROMA U.S., INC.;<br>ARKEMA INC.;<br>BASF CORPORATION;<br>BUCKEYE FIRE EQUIPMENT COMPANY;<br>CARRIER FIRE & SECURITY AMERICAS<br>   CORPORATION;<br>CARRIER FIRE & SECURITY CORPORATION;<br>CARRIER GLOBAL CORPORATION;<br>CHEMDESIGN PRODUCTS, INC.;<br>CHEMGUARD, INC.;<br>CLARIANT CORPORATION;<br>CORTEVA, INC.;<br>DUPONT DE NEMOURS, INC.;<br>DYNAX CORPORATION;<br>EIDP, INC., F/K/A E.I. DU PONT DE NEMOURS<br>   AND COMPANY;<br>KIDDE-FENWAL, INC.;<br>KIDDE PLC, INC. N/K/A KIDDE LIMITED;<br>NATIONAL FOAM, INC.;<br>THE CHEMOURS COMPANY;<br>TYCO FIRE PRODUCTS LP;<br>UNITED TECHNOLOGIES CORPORATION<br>   N/K/A RTX CORPORATION; and<br>ABC CORPORATIONS 1-10 (Names Fictitious),<br><br>       Defendants. | Case No. 2:23-cv-04294-RMG |

**STATE OF TEXAS' FIRST AMENDED COMPLAINT**

THE STATE OF TEXAS, by and thorough the Attorney General KEN PAXTON ("Attorney General") and on behalf of the public interest, along with its agencies, the Texas Commission on Environmental Quality ("TCEQ"), the Texas Parks and Wildlife Department ("TPWD"), and the Texas General Land Office ("TGLO") (collectively, the "State of Texas" or the "State"), files this civil action seeking injunctive relief, damages, civil penalties, costs, and other relief against Defendants 3M Company ("3M"); AGC Chemicals Americas, Inc. ("AGC Chemicals"); Archroma U.S., Inc. ("Archroma"); Arkema, Inc. ("Arkema"); BASF Corporation ("BASF"); Buckeye Fire Equipment Company ("Buckeye"); Carrier Fire & Security Corporation ("Carrier Fire"); Carrier Fire & Security Americas Corporation ("Carrier Fire Americas"); Carrier Global Corporation ("Carrier"); ChemDesign Products, Inc. ("ChemDesign"); Chemguard, Inc. ("Chemguard"); Clariant Corporation ("Clariant"); Dynax Corporation ("Dynax"); EIDP, Inc., f/k/a E. I. du Pont de Nemours and Company ("Old DuPont"); Kidde-Fenwal, Inc. ("KFI"); Kidde plc, Inc. n/k/a Kidde Limited ("Kidde plc"); National Foam, Inc. ("National Foam"); The Chemours Company ("Chemours"); Tyco Fire Products LP ("Tyco"); United Technologies Corporation n/k/a RTX Corporation ("UTC") (the foregoing collectively referred to as the "Manufacturer Defendants"); Corteva, Inc. ("Corteva"); DuPont de Nemours, Inc. ("New DuPont"); and ABC Corporations 1-10 (names fictitious), (collectively with Manufacturer Defendants, "Defendants").

## I.    NATURE OF THE STATE'S CASE

1.    The State of Texas brings this action pursuant to its statutory and regulatory authority and its powers under common law for injuries to the State's natural resources,[1] property,[2] and residents against Defendants.

2.    For decades, Defendants have known of the dangers of toxic per- and polyfluoroalkyl substances, including but not limited to perfluorooctane sulfonic acid ("PFOS"), perfluoroheptanoic acid ("PFHpA"), perfluorooctanoic acid ("PFOA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorodecanoic acid ("PFDA"), perfluorononanoic acid ("PFNA"), perfluorobutane sulfonic acid ("PFBS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA," also known as "GenX") (collectively, "PFAS").[3] Accordingly, Defendants have also known of the dangers of PFAS products including: (i) aqueous film-forming foam ("AFFF") used for firefighting training and emergency response at military and industrial facilities, airports, and other locations throughout the State of Texas, as well as related fluorochemicals and fluorosurfactants[4] (together with AFFF, "AFFF Products"); and (ii) PFAS released from industrial facilities and other sources.

3.    Despite knowledge of the dangers of PFAS exposure, Defendants chose not to take steps to reduce those risks; instead, they continued to advertise, market, manufacture for sale, offer

---

[1] As used herein, "natural resources" includes but is not limited to all land, water, air, wildlife, and biota owned, managed, or held in trust by the State.

[2] As used herein, "property" means any interest in real property in the possession of the State, including real property held in trust by the State.

[3] As used in this Amended Complaint, "PFAS" includes, but is not limited to, all PFOS, PFOA, PFHpA, PFHxS, PFNA, PFDA, PFBS, and HFPO-DA, including their acid, conjugate base, or salt forms as well as precursors that can degrade into these compounds, along with the compounds' neutral acid forms, anionic conjugate base forms, and neutral salt species.

[4] Fluorochemicals, or fluorinated chemicals, are man-made organic compounds containing fluorine used in the manufacture of surfactants. Fluorosurfactants, or fluorinated surfactants, are synthetic organofluorine chemical compounds that have multiple fluorine atoms.

for sale, and sell AFFF Products to, inter alia, the Federal, State and local governments, fire departments, businesses, and everyday consumers. Now that the State and the larger public are becoming aware of just some of the massive problems Defendants have created while reaping enormous profits, Defendants are seeking to foist the equally massive costs of addressing those problems onto the victims of their deceit.

4.     The U.S. Environmental Protection Agency ("EPA") claims to have identified more than 12,000 types of PFAS and has concluded that exposure to PFAS may lead to significant negative human health effects, including but not limited to: decreased fertility; preeclampsia and high blood pressure in pregnant women; adverse developmental effects in children such as low birth weight, accelerated puberty, bone variations, and behavioral changes; increased risk of certain cancers, including kidney and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; ulcerative colitis; thyroid disease; and medically diagnosed high cholesterol and/or high risk of obesity.

5.     Defendants knew that their AFFF Products, when used as intended, would cause releases of PFAS into the environment, harm people, wildlife, and biota, damage natural resources and property, and would require enormous costs to remediate due to PFAS' strong carbon-fluorine bonds making complete destruction essentially impossible. Yet they concealed information about the chemicals' negative health effects and affirmatively contradicted such information in public statements and marketing campaigns, in pursuit of profit.

6.     Defendants' tortious, deceptive, unlawful, unfair, and/or abusive actions have caused and/or contributed to significant known PFAS contamination of the State's natural resources, including air, groundwater, drinking water, surface water, soil, sediment, biota,

estuaries, submerged lands, and wetlands, and property held in trust or otherwise owned by the State. Through these actions, toxic and persistent "forever chemicals" are contaminating countless water supplies, and it will require significant effort and expense to investigate, treat, and remediate the contamination of the State's drinking water, natural resources, and/or property otherwise owned by the State.

7.      Despite expending significant public resources to study the nature and extent of existing PFAS contamination in Texas, the State has only just begun to understand the extent of the problem, and its understanding of the PFAS problem continues to grow. The PFAS contamination that Defendants caused has called for, and will call for, substantial effort and expense to investigate, treat, and remediate. The Defendants who created and profited from the creation of this problem must pay to identify and remediate PFAS contamination throughout the State.

8.      Many locations in Texas have been identified as being contaminated with PFAS caused by Defendants' AFFF Products. For example, the Air Force Plant 4, located in Tarrant County, recorded a combined PFOS and PFOA level in its groundwater as high as 201,000 parts per trillion ("ppt") in 2018, more than 350 times higher than the State's Protective Concentration Levels ("PCLs") of 290 ppt (PFOA) and 560 ppt (PFOS). The surface soil at Sheppard Air Force Base ("Sheppard AFB"), located in Wichita County, revealed concentrations of PFOS at 7,400,000 ppt and PFOA at 1,800,000 ppt, thereby exceeding the State's PCLs for these compounds.

9.      PFAS have not only harmed the State's natural resources and property but have threatened the health of Texans. Concentrations of PFOA have been found in samples of blood, urine, and tap water of Texans living near Former Reese Air Force Base ("Reese AFB"). In fact, the blood samples show that these residents had substantially higher levels of PFOA than the

national average, with concentrations reaching 59.3 mg/L, and PFHxS reaching concentrations of 486.5 mg/L. More PFAS contamination caused by Defendants' AFFF Products in the State is expected to be discovered with further investigation.

## A.    Discovery Control Plan

10.    The discovery in this case is intended to be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4.

11.    The monetary relief sought in this case is within the jurisdictional limits of this court. This lawsuit is not subject to expedited discovery under Texas Rules of Civil Procedure 47 and 169 because the relief sought by the State incudes a monetary amount over $1,000,000 and also includes a request for non-monetary relief in the form of injunctive relief.

## B.    The Parties

12.    The State of Texas is a sovereign state in the United States of America. The State holds a trust interest in the natural resources, including waters, land, and air, within the State. *See* TEX. CONST. art. XVI, § 59 ("The conservation and development of all of the natural resources of this State, . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties."). It also has an interest as sovereign and natural resource trustee in protecting these natural resources from contamination. The contamination of the waters, land, and air of the State by PFAS constitutes injury to the persons and property of the State's citizens and to the natural resources of the State, which are held in trust by the State on behalf of its citizens. The State may exercise all the authority necessary to protect its interests and those of its citizens for the common good.

13.    The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust - i.e., the natural resources—for the beneficiaries of the trust—i.e., the public. Protection

of natural resources of the State is a matter of grave public concern in which the State has an interest apart from that of particular individuals who may be affected. Pollution of the natural resources of the State with PFAS has negatively affected, and will continue to negatively affect, a substantial segment of the State's population.

14.     The State brings this action pursuant to its police powers, which include but are not limited to, its powers and duties to enforce its laws; its powers to prevent and abate pollution of the natural resources of the State; to prevent and abate nuisances; and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

15.     The State also brings this suit in its *parens patriae* capacity for the benefit of citizens of the State.

16.     TCEQ, TPWD, and TGLO are three agencies of the State that serve as natural resource trustees.

17.     TCEQ is a statutorily created agency charged with the "primary responsibility for implementing the constitution and laws of this state relating to the conservation of natural resources and the protection of the environment." TEX. WATER CODE § 5.012. TCEQ also administers and enforces the State's water quality standards and permits.

18.     TPWD is another statutorily-created agency that serves as a natural resource trustee for the State. TPWD holds "primary responsibility for protecting the state's fish and wildlife resources." TEX. PARKS & WILD. CODE § 12.0011(a). TPWD "administer[s] the laws relating to game, fish, oysters, and marine life, as set out in this code." *Id.* § 12.001(a).

19.     TGLO is an agency of the State created by Section 1 in Article XIV of the Texas Constitution, formed to supervise and manage the State's lands and coastal resources. *See* TEX. *See* TEX. CONST. art. XVI, § 1; TEX. NAT. RES. CODE § 31.051. TGLO, through its commissioner,

must "execute and perform all acts and other things relating to public real property of the state or rights of individuals in public real property which is required by law." TEX. NAT. RES. CODE § 31.051.

20.     At all relevant times, Defendants together controlled all, or substantially all, of the market for AFFF Products in the State.

21.     Defendant 3M Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF-containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed of in the State. 3M is registered to do business in Texas and may be served through Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701, or wherever it may be found.

22.     Defendant AGC Chemicals Americas, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals[5] containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed of in the State. AGC

---

[5] Fluorochemicals, or fluorinated chemicals, are organic compounds containing fluorine used in the manufacture of surfactants. Fluorosurfactants, or fluorinated surfactants, are synthetic organofluorine chemical compounds that have multiple fluorine atoms.

Chemicals is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

23.     Defendant Archroma U.S., Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma, a subsidiary of Archroma Management, LLC, has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. On information and belief, Archroma is a successor to Clariant, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Archroma is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

24.     Defendant Arkema Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Arkema is registered to do business in Texas and may be served though Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701, or wherever it may be found.

9

25.    Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation). On information and belief, Ciba Inc. designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. BASF is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

26.    Defendant Buckeye Fire Equipment Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Under Tex. Civ. Prac. & Rem. Code § 17.044, Buckeye Fire may be served through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711.

27.    Defendant Carrier Fire & Security Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc., which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier

Fire is the entity formerly known as UTC Fire & Security Corporation ("UTC F&S"),[6] following the spinoff transaction described in Paragraph 29 below. UTC F&S is the successor to Kidde Limited, f/k/a Kidde plc, which, as set forth below, assumed historical liabilities for the AFFF business operated by the National Foam brand in 2000. UTC F&S is also liable for the AFFF business through its ownership of, control over, and conduct associated with the business operations related to AFFF, including with respect to communications to regulators and efforts to capture AFFF market share. On or about September 28, 2020, UTC F&S changed its name to Carrier Fire. At no time did Carrier Fire/UTC F&S disclose the dangers related to AFFF. Carrier Fire is registered to do business in Texas and may be served through United Agent Group, Inc., 5444 Westheimer, Ste. 1000, Houston, Texas 77056, or wherever it may be found.

        28.      Defendant Carrier Fire & Security Americas Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire Americas is a subsidiary of Carrier Global Corporation and is the direct parent of Kidde-Fenwal, Inc.'s direct parent, Kidde Fire Protection, Inc. Carrier Fire Americas is the entity formerly known as UTC Fire & Security Americas Corporation ("UTC F&S Americas").[7] UTC F&S Americas is also liable for the AFFF business through its ownership of, control over, and conduct associated with the business operations related to AFFF, including with respect to communications to regulators and efforts to capture AFFF market share. On or about October 1, 2020, UTC F&S Americas changed its name to Carrier Fire Americas. At no time did Carrier Fire Americas/UTC F&S Americas disclose the

---

[6] This Amended Complaint refers to UTC F&S when describing historical conduct and transactions that occurred during its existence and to Carrier Fire when identifying the entity that is presently liable for such conduct.

[7] This Amended Complaint refers to UTC F&S Americas when describing historical conduct and transactions that occurred during its existence and to Carrier Fire Americas when identifying the entity that is presently liable for such conduct.

dangers related to AFFF. Carrier Fire Americas is registered to do business in Texas and may be served through United Agent Group, Inc., 5444 Westheimer, Ste. 1000, Houston, Texas 77056, or wherever it may be found.

29.     Defendant Carrier Global Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement by and Among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation (the "2020 Separation Agreement"), Carrier assumed certain liabilities, including those related to the AFFF business manufactured and sold under the National Foam brand, which includes the liabilities of Kidde-Fenwal, Inc., Kidde Limited, UTC F&S, UTC F&S Americas, and UTC. Carrier also agreed to indemnify UTC for such liabilities pursuant to the 2020 Separation Agreement. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde. Carrier conducts business throughout the United States, including in the State. Carrier is registered to do business in Texas and may be served through United Agent Group, Inc., 5444 Westheimer, Ste. 1000, Houston, Texas 77056, or wherever it may be found.

30.     Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143. On information and belief, ChemDesign designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF, primarily to Chemguard, that was transported, stored, used, handled,

trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Under Tex. Civ. Prac. & Rem. Code § 17.044, ChemDesign may be served through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711.

31.     Defendant Chemguard, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was used in the State. Furthermore, Chemguard has designed, manufactured, marketed, promoted, distributed, and sold AFFF containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State and also has designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Chemguard is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

32.     Defendant Clariant Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has designed, manufactured, marketed, promoted, distributed, and/or sold fluorochemicals containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Clariant is registered to do business in Texas and may be served through

Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th St., Ste. 620, Austin, Texas 78701, or wherever it may be found.

33.    Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. Corteva is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

34.    Defendant DuPont de Nemours, Inc. (i.e., New DuPont), f/k/a DowDuPont Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic liabilities and assets to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. New DuPont does business throughout the United States, including in the State. Under Tex. Civ. Prac. & Rem. Code § 17.044, New DuPont may be served through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711.

35.    Defendant Dynax Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, promoted, distributed, sold, released, emitted, and//or discharged PFAS, including PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released,

14

spilled, otherwise discharged, and disposed in the State. Under Tex. Civ. Prac. & Rem. Code § 17.044, Dynax may be served through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711.

36.     Defendant EIDP, Inc. (i.e., Old DuPont), f/k/a E. I. du Pont de Nemours and Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, promoted, distributed, and sold fluorochemicals and fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Under Tex. Civ. Prac. & Rem. Code § 17.044, Old DuPont may be served through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711.

37.     Defendant Kidde-Fenwal, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. KFI is the successor in interest to Kidde Fire Fighting, Inc. ("KFF") by way of merger, which occurred on or around 2007. At all times relevant, KFI and/or its predecessors designed, manufactured, marketed, promoted, distributed, and/or sold AFFF Products throughout the United States, including in Texas. On May 14, 2023, KFI filed for bankruptcy relief in the United States Bankruptcy Court for the District of Delaware, thereby commencing the Chapter 11 case captioned In re Kidde-Fenwal, Inc., Case No. 23-10638-LSS (D. Del. Bankr.).[8] In April 2024, the Bankruptcy Court approved the sale of certain of KFI's assets to Pacific Erin Opco, LLC. *See*

---

[8] Pursuant to a stipulation with KFI and other parties in interest in the Bankruptcy Case, the State is permitted to name KFI as a Defendant in the instant action, but cannot prosecute its claims against it due to the automatic stay in effect as a result of KFI's bankruptcy filing. *See* Adv. Pro. No. 23-50387, Docket No. 91, at ¶ 2 (the "Stay Extension Stipulation"). The Stay and Injunction Period (as defined in the Stay Extension Stipulation) has been subsequently extended to November 7, 2024 by agreement of parties in interest in the Bankruptcy Case.

*In re Kidde-Fenwal, Inc.*, No. 23-106388-LSS, Dkt. 1058 (D. Del. Bankr. April 2024). KFI is registered to do business in Texas and may be served through United Agent Group, Inc., 5444 Westheimer, Ste. 1000, Houston, Texas 77056, or wherever it may be found.

38.     Defendant Kidde plc, Inc. n/k/a Kidde Limited[9] is a private limited company organized under the laws of England, with its principal place of business located at First Floor, Ash House, Littleton Road, Ashford, Middlesex, England TW15, 1TZ. Kidde plc was part of United Technologies Corporation from 2005 through 2020. At all relevant times, Kidde plc conducted business throughout the United States, including in Texas. Kidde plc, through Kidde/Kidde Fire, designed, manufactured, marketed, promoted, distributed, and/or sold AFFF Products throughout the United States, including in Texas.

39.     Defendant National Foam, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the National Foam and Angus brand of products (collectively, "National Foam/Angus Fire"). These products included AFFF Products marketed for years under the name National Foam (the "National Foam Business"). National Foam/Angus Fire has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF Products that were used and/or disposed of in Texas. National Foam is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

40.     Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street,

---

[9] This Amended Complaint refers to Kidde plc when describing historical conduct and transactions that occurred during its existence and to Kidde Limited when identifying the entity that is presently liable for such conduct.

Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Chemours has designed, manufactured, marketed, promoted, distributed, and/or sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State. Chemours is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

41.     Defendant Tyco Fire Products LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Tyco manufactures the Ansul brand of products and is the successor in interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and disposed in the State and also has designed, manufactured, marketed, and sold fluorosurfactants containing PFAS used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in the State. Tyco is registered to do business in Texas and may be served through CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201, or wherever it may be found.

42.     Defendant United Technologies Corporation n/k/a RTX Corporation is a Delaware corporation. Following the merger of United Technologies Corporation and the Raytheon Company in April 2020, United Technologies Corporation was renamed Raytheon Technologies Corporation, which entity was recently renamed RTX Corporation. UTC through its ownership of, control over, and conduct associated with the National Foam Business, designed, manufactured,

marketed, promoted, distributed, and/or sold AFFF Products throughout the United States, including in Texas. UTC is registered to do business in Texas and may be served through CT Corporation Systen, 1999 Bryan St., STW. 900, Dallas, Texas 75201, or wherever it may be found.

43.     Defendants ABC Corporations 1 through 10, unknown at this time, are manufacturers of AFFF, manufacturers of fluorochemicals and fluorosurfactants that contained PFAS used to make AFFF, and/or distributors of AFFF Products that have caused in injuries to the State's natural resources or otherwise share responsibility for such injuries. When these ABC Corporations are identified, they will be added by name.

**C.     Jurisdiction**

44.     The State filed this action in Tarrant County District Court in the State of Texas on May 30, 2023. Defendants removed the case to United States District Court for the Northern District of Texas on August 11, 2023, and transferred it to this multidistrict litigation on August 15, 2023. By filing this First Amended Complaint ("Amended Complaint"), the State does not concede that this Court, or the United States District Court for the Northern District of Texas, has subject-matter jurisdiction over this action. The State reserves all rights and immunities with respect to whether federal jurisdiction is proper.

45.     The public natural resources that are the subject of this suit are all within the State of Texas. The State is not a citizen of any state for diversity purposes, and thus no diversity jurisdiction exists as a basis for federal jurisdiction. No federal subject-matter jurisdiction is invoked herein.

46.     As described above, each Defendant named here maintains sufficient minimum contacts with the State such that this Court's exercise of jurisdiction over it is not contrary to the provisions of the Constitution or laws of the United States; Article V, Section 8 of the Texas

Constitution; and this Court therefore has jurisdiction pursuant to Section 24.007 of the Texas Government Code.

47.     Jurisdiction is also proper pursuant to Sections 7.002 and 7.105 of the Texas Water Code and Section 12.105 of the Texas Parks & Wildlife Code.

**D.    Venue**

48.     The State incorporates by reference every allegation set forth in Paragraph 44 as if fully restated in this count.

49.     Venue is proper in Tarrant County pursuant to Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code because some part of the property that is subject to the action is located there and because some part of the cause of action arose there. Property contaminated by Defendants' AFFF Products is located throughout the State, including in Tarrant County. The injury caused by Defendants' conduct is located throughout the State, including in Tarrant County. The property and injury in question includes but is not limited to water, wildlife, land, submerged lands, and public lands within the State, including those within Tarrant County. Defendants' AFFF Products were sold and used in Tarrant County. Venue is also proper in Tarrant County pursuant to Section 7.105 of the Texas Water Code and Section 2001.202 of the Texas Government Code.

## II.    STATUTORY AND REGULATORY BACKGROUND[10]

**A.    Regulation of PFAS, Including AFFF Products**

50.     The State of Texas actively regulates the use of PFAS, including AFFF Products that contain PFAS.

---

[10] The State has also been delegated the authority to enforce several federal programs that also regulate PFAS, including, but not limited to, the Clean Water Act, Safe Drinking Water Act, and Clean Air Act.

51.     For example, through TCEQ's Texas Risk Reduction Program ("TRRP"), the State has established PCLs for sixteen (16) PFAS constituents in soil and groundwater. PCLs serve as the default cleanup standards in the TRRP. *See* 30 TEX. ADMIN. CODE § 350 *et seq.* These 16 PFAS include: PFOS, PFOA, PFHxS, PFNA, PFDA, PFBS, perflurohexanoic acid ("PFHxA"), perfluoropentanoic acid ("PFPeA"), perfluorodecanesulfonic acid ("PFDS"), perfluoroundecanoic acid ("PFUnDA"), perfluorooctanesulfonamide ("PFOSA"), perfluorotridecanoic acid ("PFTrDA"), perfluorotetradecanoic acid ("PFTeDA"), perfluorododecanoic acid ("PFDoA"), perfluoroheptanoic acid ("PFHpA"), and perfluorobutanoic acid ("PFBA").[11] The TRPP PCLs for groundwater ("GW") are as follows:

| Type of PFAS | GW PCL | Type of PFAS | GW PCL | Type of PFAS | GW PCL |
|---|---|---|---|---|---|
| PFHxS | 93 ppt | PFOA PFNA PFDS PFUnDA PFOSA PFTrDA PFTeDA PFDoA | 290 ppt | PFDA | 370 ppt |
| | | | | PFOS PFHpA | 560 ppt |
| | | | | PFHxA PFPeA | 12,000 ppt |
| | | | | PFBA | 24,000 ppt |
| | | | | PFBS | 34,000 ppt |

52.     TCEQ also set effects screening levels for three PFAS compounds: PFOS, PFOA, and ammonium perfluorooctanoate ("APFO").[12] Effects screening levels are used by TCEQ in the air permitting process to evaluate the potential for health effects to occur from exposure to a

---

[11]   *See* Texas Comm'n on Env't Quality, *TRRP Protective Concentration Levels*, https://www.tceq.texas.gov/remediation/trrp/trrppcls.html (last visited July 12, 2024).

[12] *See* Texas Comm'n on Env't Quality, *About Effects Screening Levels*, https://www.tceq.texas.gov/toxicology/esl (last visited July 12, 2024).

specific pollutant in the air. TCEQ established both 1-hour and yearly effects screening levels, as follows:

| Compound | 1-hour effects screening level | Yearly effects screening level |
|----------|-------------------------------|-------------------------------|
| PFOS | 0.1 microgram per cubic meter | 0.01 microgram per cubic meter |
| PFOA | 0.05 microgram per cubic meter | 0.005 microgram per cubic meter |
| APFO | 0.1 mircogram per cubic meter | 0.01 microgram per cubic meter |

53.     Federal agencies are also taking action to address PFAS. For example, with respect to PFAS in drinking water, EPA's actions include the following: (1) in March 2021, EPA issued a final determination to regulate PFOA and PFOS as contaminants under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq.*;[13] (2) in December 2021, EPA published the final fifth Unregulated Contaminant Monitoring Rule, which will require public water systems around the country to monitor for twenty-nine (29) PFAS compounds between 2023 and 2025;[14] (3) in June 2022, EPA issued interim health advisory levels for PFOA at 0.004 ppt, for PFOS at 0.02 ppt, and final health advisories for GenX at 10 ppt and PFBS at 2,000 ppt;[15] (4) in March 2023, EPA proposed to establish maximum contaminant levels ("MCLs") for PFOS and PFOA, as well as maximum contaminant level goals for PFOS, PFOA, PFHxS, PFNA, PFBS, and HFPO-DA pursuant to the SDWA;[16] and (5) in April 2024, EPA finalized and published the rule establishing individual MCLs for PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA, as well as mixtures

---

[13] Announcement of Final Regulatory Determinations for Contaminants on the Fourth Drinking Water Contaminant Candidate List, 86 Fed. Reg. 12272 (Mar. 3, 2021) (codified at 40 C.F.R. pt. 141).

[14] Revisions to the Unregulated Contaminant Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021) (codified at 40 C.F.R. pt. 141).

[15] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[16] PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (proposed Mar. 29, 2023) (to be codified at 40 C. F. R. pts. 141 and 142).

containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS in drinking water pursuant to the SDWA.[17] Under the rule, public water systems across the United States will need to monitor for these PFAS, notify the public of detections, and take action to remove PFAS in concentrations above those levels.[18]

54.    Additionally, with respect to remediation of contaminated sites, EPA has taken the following regulatory actions: (1) in May 2022, EPA added five PFAS compounds to a list of risk-based values for site cleanups known as Regional Screening Levels and Regional Removal Management Levels;[19] (2) in September 2022, EPA proposed to designate PFOA and PFOS as "hazardous substances" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*;[20] (3) in April 2023, EPA issued an Advance Notice of Proposed Rulemaking asking the public for input regarding potential future "hazardous substance" designations of additional PFAS pursuant to CERCLA;[21] (4) in February 2024, EPA proposed to designate nine PFAS, their salts, and their structural isomers as "hazardous constituents" pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*;[22] and (5) in May 2024, EPA published the final rule designating PFOA and PFOS as "hazardous substances" pursuant to CERCLA.[23]

---

[17] PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024) (to be codified at 40 C.F.R. Parts 141 and 142)

[18] *Id.*

[19] Press Release, U.S. Env't Prot. Agency, EPA Adds Five PFAS Chemicals to List of Regional Screening and Removal Management Levels to Protect Human Health and the Environment (May 18, 2022).

[20] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 FR 54415 (proposed Sept. 6, 2022) (to be codified at 40 C.F.R. pt. 302).

[21] Addressing PFAS in the Environment, 88 Fed. Reg. 22399 (April 13, 2023) (to be codified at 40 C.F.R. pt. 302).

[22] Listing of Specific PFAS as Hazardous Constituents, 89 Fed. Reg. 8606 (proposed Feb. 8, 2024) (to be codified at 40 C.F.R. pts. 261 and 271).

[23] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39124 (May 8, 2024) (to be codified at 40 C.F.R. pt. 302).

55.     With respect to use of PFAS in products and processes, the EPA has proposed and issued numerous regulations, including the following: (1) in June 2021, the EPA proposed a rule to require current or past manufacturers or importers of PFAS in any year since January 1, 2011 to submit information to EPA about the use, volume, byproducts, disposal, exposure, and environmental and health effects of PFAS;[24] (2) in January 2023, EPA proposed a significant new use rule pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.,* that would prevent anyone from starting or resuming, without a complete EPA review and risk determination, the manufacture, processing, or use of an estimated 300 PFAS that have not been made or used for many years, known as "inactive PFAS";[25] (3) in October 2023, EPA published a final rule that implemented its June 2021 proposed rule on PFAS reporting requirements;[26] and (4) in January 2024, EPA published the final significant new use rule pursuant to TSCA for 329 "inactive PFAS."[27]

56.     With respect to PFAS in discharges of wastewater, EPA has taken the following actions: (1) in April 2022, EPA issued a memorandum outlining how it would monitor PFAS pursuant to the National Pollutant Discharge Elimination System ("NPDES") program of the Federal Water Pollution Control Act (a/k/a the Clean Water Act), 33 U.S.C. §§ 1251 *et seq* for facilities where PFAS are expected to be present in their discharge;[28] (2) in December 2022, EPA

---

[24] TSCA Section 8(a)(7) Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances, 86 Fed. Reg. 33926 (proposed June 28, 2021) (to be codified at 40 C.F.R. pt. 705).

[25] Per- and Poly-Fluoroalkyl Chemical Substances Designated as Inactive on the TSCA Inventory; Significant New Use Rule, 88 Fed. Reg. 4937 (proposed Jan. 26, 2023) (codified at 40 C.F.R. pt. 721).

[26] Toxic Substances Control Act Reporting and Recordkeeping Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances, 88 Fed. Reg. 70516 (Oct. 11, 2023) (codified at 40 C.F.R. pt. 705).

[27] Per- and Poly-Fluoroalkyl Chemical Substances Designated as Inactive on the TSCA Inventory; Significant New Use Rule, 89 Fed. Reg. 1822 (Jan, 11, 2023) (codified at 40 C.F.R. pts. 709 and 721).

[28] Memorandum from the U.S. Env't Prot. Agency on Addressing PFAS Discharges in EPA-Issued NPDES Permits and Expectations Where EPA is the Pretreatment Control Authority (Apr. 28, 2022).

issued a memorandum providing guidance to states on how to use the NPDES permitting program of the Clean Water Act to reduce harmful PFAS pollution;[29] (3) in January 2023, EPA released its final Effluent Limitations Guidelines ("ELGs") Program Plan 15, including a determination that revised ELGs and pretreatment standards are warranted for reducing PFAS in leachate discharges from landfills, an announcement of an expansion of the ongoing study of PFAS discharges from textile manufacturers, and a new study of waste streams to wastewater treatment plants;[30] and (4) in October 2024, USEPA issued final recommended aquatic life criteria and benchmarks for select PFAS, which "provide information that States and Tribes may consider when adopting water quality standards."[31]

57.      With respect to reporting releases of PFAS to the environment, EPA's actions include the following activities: (1) in June 2023, EPA added nine PFAS compounds to the Toxic Release Inventory ("TRI") as well as to the list of reportable chemicals pursuant to the Emergency Planning and Community Right-to-Know Act and the Pollution Prevention Act;[32] (2) in October 2023, EPA issued a final rule that added all PFAS included on the Toxics Release Inventory ("TRI") to the list of "chemicals of special concern," which imposed reporting obligations for those who manufacture, process, or used those PFAS, even at small, or de minimis, concentrations;[33] (3) in May 2024 EPA enacted a rule to add seven PFAS to the list of chemicals covered by the TRI, and thus classified as "chemicals of special concern" that are not subject to

---

[29] Memorandum from the U.S. Env't Prot. Agency on Addressing PFAS Discharges in NPDES Permits and Through the Pretreatment Program and Monitoring Programs (Dec. 5, 2022).

[30] U.S. ENV'T PROT. AGENCY, EFFLUENT GUIDELINES PROGRAM PLAN 15 (2023).

[31] Final Recommended Aquatic Life Criteria and Benchmarks for Select PFAS, 89 Fed. Reg. 81077 (Oct. 7, 2024).

[32] Implementing Statutory Addition of Certain Per- and Polyfluoroalkyl Substances (PFAS) to the Toxics Release Inventory Beginning With Reporting Year 2023, 88 Fed. Reg. 41035 (June 23, 2023).

[33] Changes to Reporting Requirements for Per- and Polyfluoroalkyl Substances and to Supplier Notifications for Chemicals of Special Concern; Community Right-to-Know Toxic Chemical Release Reporting, 88 Fed. Reg. 74360 (Oct. 31, 2023) (codified at 40 C.F.R. pt. 372).

the de minimis exemption;[34] and (4) on October 8, 2024, EPA proposed to add PFAS categories representing over 100 individual PFAS to the TRI. Because PFAS are used at low concentrations in many products, EPA's actions taken in October 2023 and May 2024 ensure that covered industry sectors and federal facilities that make or use TRI-listed PFAS can no longer rely on the de minimis exemption to avoid disclosing their PFAS releases and other waste management quantity information for these chemicals. Additionally, If the October 8, 2024 rule is finalized as proposed, all PFAS in a given category would count towards the reporting threshold for that category, ensuring that facilities would not be able to avoid reporting on PFAS that are similar to one another if each PFAS does not meet the reporting threshold individually.

## B.    Texas' Uniform Fraudulent Transfer Act

58.    The State of Texas has adopted the Uniform Fraudulent Transfer Act ("TUFTA") to prevent the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets beyond their reach. *See* TEX. BUS. & COMM. CODE §§ 24.001 to 24.013. The Uniform Fraudulent Transfer Act has been enacted by a majority of states in substantively identical form, including in the State of Delaware, the state where the fraudulent transfer that form the basis for the State's claims occurred. *See* DEL. CODE tit. 6, §§ 1301 to 1311.

59.    Under TUFTA's actual fraudulent transfer provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. *See* TEX. BUS. & COMM. CODE §§ 24.005(1), 24.008(a)(1).

60.    TUFTA's constructive fraudulent transfer provision provides that a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or

---

[34] Implementing Statutory Addition of Certain Per- and Polyfluoroalkyl Substances (PFAS) to the Toxics Release Inventory Beginning With Reporting Year 2024, 89 Fed. Reg. 43331 (May. 17, 2024) (codified at 40 C.F.R. pt. 372).

obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due"; or (iii) "was insolvent or became insolvent shortly after the transfer was made." *See id.* §§ 24.005(a)(1)-(2)(A)-(B), 24.006(a).

### III.     FACTUAL ALLEGATIONS

**A.     The Harmful Impacts of PFAS From AFFF Products on the Environment, Animals, and Human Health**

61.     PFAS, including but not limited to PFOS, PFOA, PFHxS, PFNA, PFHpA, PFDA, PFBS, and GenX chemicals, have characteristics that cause extensive and long-lasting environmental contamination.

62.     AFFF is a PFAS-containing fire-suppressing foam used to extinguish flammable liquid fires, including jet-fuel fires, aviation-related fires, hangar fires, ship fires, and chemical fires and has historically been used to train firefighters and test firefighting equipment.

63.     When AFFF Products are used as intended, PFAS contamination occurs through direct application or discharge to air, soils, sediment, surface water, and groundwater, causing large quantities of foamy water laced with PFAS to enter the environment at each firefighting event or training exercise.

64.     PFAS are highly fluorinated synthetic chemical compounds made up of chains of carbon and fluorine atoms bonded together. The carbon-fluorine bond is one of the strongest bonds in chemistry and gives PFAS their unique chemical properties. The carbon-fluorine bond found in PFAS generally does not occur in nature.

65.     PFAS are mobile and persist in the environment. Once introduced into the environment, including through air emissions,[35] PFAS spread quickly because they easily dissolve in water. Thus, PFAS have reached water systems within the State. PFAS also persist in the environment indefinitely because of their multiple carbon-fluorine bonds, which are resistant to metabolic and environmental degradation processes.

66.     PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are very slowly excreted from individual organisms, ongoing low-level exposure results in a buildup of PFAS within the body. Thus, they also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

67.     PFAS are toxic and cause significant adverse effects to human health, especially when present in drinking water. For example, the EPA and the Toxic Substances and Disease Registry has associated PFOS exposure with numerous adverse health effects in humans, including increases in serum lipids (i.e., medically diagnosed high cholesterol); decreases in antibody response to vaccines; increases in risk of childhood infections; and adverse reproductive and developmental effects, along with pregnancy induced hypertension and preeclampsia. PFOA exposure is associated with, among other things, decreased birthweight, testicular, kidney and pancreatic cancers, ulcerative colitis, medically diagnosed high cholesterol, and thyroid disease.

68.     Removal of PFAS from water sources, including drinking water, requires specialized, expensive drinking water treatment systems. Additionally, once PFAS are removed

---

[35] The EPA recognizes PFAS air emissions as a significant route for PFAS released into the environment. *See* Ryan J., U.S. Env't Prot. Agency, Presentation on EPA PFAS Air Emission Measurements: Activities and Research (June 6, 2019).

from drinking water, they must be disposed of in a safe manner, which is costly and creates new risks.

69.     In short, once PFAS are used, they are inevitably released to and then migrate through the environment, where they resist natural degradation; contaminate groundwater, drinking water and other natural resources; damage human and animal life, injure state property and are difficult and costly to remove.

**B.     Affected Natural Resources**

70.     The Texas Constitution establishes the State's right and obligation to protect its natural resources. *See* TEX. CONST. art. XVI, § 59(a). Article 16, section 59 of the Texas Constitution provides that "the conservation and development of all of the natural resources of this State . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties." *Id.*

71.     As such, it is the State's policy to "minimize the impact of pollution in order to reduce risk to public health and the environment and continue to enhance the quality of air, land, and waters of the state where feasible." TEX. HEALTH & SAFETY CODE § 361.502.

72.     The State Legislature has determined that "[t]he waters of the state are held in trust for the public . . ." TEX. WATER CODE § 11.0235(a). This includes "the water and the beds and shores of the Gulf of Mexico and the arms of the Gulf of Mexico . . . including all land which is covered by the Gulf of Mexico and the arms of the Gulf of Mexico either at low tide or high tide." TEX. NAT. RES. CODE § 11.012. Accordingly, the State holds its waters in trust for the State's residents. *See* TEX. WATER CODE § 11.0235(b) ("Maintaining the biological soundness of the state's rivers, lakes, bays, and estuaries is of great importance to the public's economic health and general well-being.").

73.     The Texas Water Code further provides that, "consistent with the protection of the public health and welfare, the propagation and protection of terrestrial and aquatic life, the protection of the environment, the operation of existing industries, and the maintenance and enhancement of the long-term economic health of the state, it is the goal of groundwater policy in this state that the existing quality of groundwater not be degraded." *Id.* § 26.401(b).

74.     "[P]rotection of the environment and public health and welfare requires that groundwater be kept reasonably free of contaminants that interfere with present and potential uses of groundwater[.]" *Id.* § 26.401(a)(1). Accordingly, the statute maintains that "discharges of pollutants, disposal of wastes, or other activities subject to regulation by state agencies be conducted in a manner that will maintain present uses and not impair potential uses of groundwater or pose a public health hazard[.]" *Id.* § 26.401(c)(1).

75.     Similarly, "[a]ll the beds and bottoms and the products of the beds and bottoms of the public rivers, bayous, lagoons, creeks, lakes, bays, and inlets in this state and of that part of the Gulf of Mexico within the jurisdiction of this state are the property of this state." *See* TEX. PARKS & WILD. CODE § 1.011(c).

76.     The State also owns "[a]ll wild animals, furbearing animals, wild birds, and wild fowl" and "all fish and other aquatic animal life contained in the freshwater rivers, creeks, and streams and in lakes or sloughs subject to overflow from rivers or other streams within the borders of this state." *Id.* § 1.011(a)-(b).

77.     PFAS attributable to AFFF Products have been found in groundwater, surface water, sediments, and soils in the State where AFFF Products were used, stored, disposed of, or otherwise discharged. Furthermore, it is likely that additional contamination to natural resources from PFAS attributable to AFFF Products will be uncovered as its investigation continues.

78.     Contamination from PFAS attributable to AFFF Products persists in the State's natural resources (i.e., it does not break down in the environment); damages their intrinsic (i.e., inherent existence) value; and impairs the public benefits derived from access to, use, and enjoyment of the State's natural resources.

79.     The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely upon maintaining a clean environment for their tourists, recreational visitors, fisherman, and other patrons to visit and enjoy.

### i.     Atmosphere

80.     Clean air is imperative for the protection of public health and welfare, and the environment as air quality greatly affects the quality of other natural resources, terrestrial and aquatic ecosystems, and human health.

81.     PFAS have been released into the ambient air within the State. AFFF Products are a significant source of PFAS air emissions because these chemicals are released into the air during their application.

### ii.     Groundwater

82.     Groundwater is a critical ecological natural resource for the people of the State, as the State relies on groundwater for drinking, irrigation, and agriculture, among other uses. In fact, groundwater provides approximately sixty percent of the total water used annually in Texas.

83.     According to the Texas Comptroller's Office, seventy-four percent—an overwhelmingly vast majority—of available groundwater in Texas is used for irrigation. Specifically, this water serves to grow plants and water crops and livestock that feed millions of Texans.

84.     The State also relies on groundwater for drinking water supplies. As of August 2024, of approximately 7,231 monitored public water systems, 5,741 rely on groundwater as a primary or secondary source of drinking water.

85.     Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems. In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State. Groundwater also keeps water in rivers during times of drought. During the summer months, and when there is little rain, native fish and other aquatic species rely on groundwater to support stream flow, modulate temperatures, and regulate nutrients.

86.     Groundwater promotes cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides groundwater stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

87.     Groundwater and the State's other natural resources are unique resources that help sustain the State's economy.

88.     AFFF Products are a significant source of PFAS contamination in groundwater; they mobilize in and through groundwater sources to reach areas beyond the location of the AFFF Products' use. This contamination has had and will continue to have severe and adverse effects on the State's groundwater.

89.     Investigations in the State have revealed elevated levels of PFAS in the groundwater near military facilities where AFFF is believed to have been used. For example, in 2018, groundwater sampled at Sheppard AFB—located at 1810 J Ave., Sheppard AFB, Wichita Falls, Wichita County, Texas 76311—detected PFOS and PFOA concentrations of 550,000 ppt and 140,000 ppt respectively. Also in 2016, sampling conducted at Corpus Christi Texas Naval

Air Station ("Corpus Christi NAS")—located at 11001 D St., #101, Corpus Christi, Nueces County, Texas 78418—showed concentrations of PFOS at 155,000 ppt and PFOA at 358,000 ppt. Over thirty other military sites in Texas have groundwater that has been contaminated with PFAS.

90.     Investigation of contamination from AFFF Products in groundwater in the State is ongoing.

### iii.     Surface Water

91.     Surface water is a critical ecological resource of the State. Surface water—which includes all water in the State's rivers, lakes, streams, and wetlands—accounts for approximately 42% of the State's total water supply. The State's surface water has been contaminated by PFAS as a result of AFFF Products. Indeed, PFAS have been detected in the State's water bodies and in the Gulf of Mexico.

92.     In addition to drinking water, surface water in the State is also used for commercial; industrial; agricultural; and recreational purposes, including swimming, boating, and fishing. The State's farming and manufacturing livelihoods depend on the State's surface water, which uses nearly half of the State's surface water. The tourism, recreation and fishing and aquaculture industries, which are dependent on clean water, are vital to the State's economy; surface water also provides aesthetic and ecological value, including supporting aquatic and marine ecosystems, nearby communities, and the residents of the State.

93.     PFAS are mobile in water and can spread great distances from the point of discharge. PFAS contamination attributable to the use of AFFF Products in the State has reached and contaminated surface water throughout the State and the Gulf of Mexico.

94.     Investigation of contamination from AFFF Products in surface water in the State is ongoing.

### iv.     Coastal Resources, Bays, and Estuaries

95.     The State's coastal resources, bays, and estuaries are critical ecological and economic resources, and contain some of the largest and most ecologically productive coastal estuaries in the country. Coastal resources, bays, and estuaries provide vital ecosystems and nursery habitats for many important Gulf species, including oysters, fish, shrimp, and small crabs. The State's coastal barrier islands and wetlands provide habitat and protection from storms for residents of the State of Texas and millions of migrating waterfowl, shorebirds, and neotropical migratory birds from throughout the western hemisphere. The State's estuaries annually produce millions of pounds of seafood and the marine commerce that stems from the coastal resources are substantial. Many State citizens depend on the coastal resources for employment, and sustenance, and reside near these resources.

96.     Additionally, the State contains seven major estuaries fronting the Gulf of Mexico, as well as numerous minor estuaries. Estuaries are partially enclosed bodies of water surrounding coastal habitats where saltwater from the ocean mixes with fresh water from rivers and streams within the State.

97.     Estuaries provide habitat for many kinds of marine life and commercially important species. For example, saltwater marsh and seagrass meadows—submergent flowering plants found in estuaries—provide food and shelter for various fish and wildlife.

98.     The Gulf of Mexico, which contains close to forty estuaries overall, has been contaminated with PFAS, including along the Texas shoreline. Records reveal PFAS migrated to the gulf from military sites, including the Corpus Christi NAS. These coastal habitats and estuaries are some of the most imperiled marine habitats due to the AFFF Products' contamination and serve as long-term reservoirs of PFAS, where PFAS are stored and released over time, impacting the

estuaries and increasing PFAS concentrations in the very cells and tissues of the shellfish and other wildlife that people eat.

99.    For example, concentrations of PFOS have been found in oysters collected from the Gulf of Mexico, including along the Nueces Bay, which is in close proximity to the Corpus Christi NAS.

100.    Investigation of AFFF Products-related PFAS contamination in the coastal areas and estuaries and public lands in the State is ongoing.

**v.    Sediments, Soils, and Submerged Land**

101.    The State's sediments, soils, and submerged lands are critical components of the State's complex ecological and economic resources. Sediments, soils, and submerged lands sustain a wide diversity of plants and animals that are essential to a healthy ecosystem. They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

102.    Sediments and soils serve as a long-term reservoir of PFAS, where PFAS are stored and released over time, impacting biota and, through bioaccumulation, increasing PFAS concentrations in fish tissue, other wildlife, and plants.

103.    PFAS contamination caused by the use of AFFF Products in the State has reached and adversely affected soil and sediment throughout the State. For example, surface soil at or near Sheppard AFB contains 7,400,000 ppt of PFOS and 1,800,000 of PFOA. Samples conducted in at least two other military bases detected PFAS in the soil.

104.    Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the State. PFAS in sediments, as well as in surface water, increase PFAS concentrations in fish.

105.    Investigation of contamination from AFFF Products in sediments, soils, and submerged lands in the State is ongoing.

**vi.    Biota**

106.    Biota, including the State's flora and fauna, are critical ecological resources. The State is home to more than 4,600 plant species and subspecies, including Bluebonnet, Texas Sedge, American Water-Willow, Texas Sage, American Beautyberry and Winged Elm. The State's wildlife numbers over 1,200 species, including 142 mammals, 247 freshwater fish, 629 birds, 71 amphibians, and 120 reptiles.

107.    There are 210 species—171 species of animals and 39 species of plants—in the State that the State lists as threatened or endangered. Contamination attributable to PFAS from AFFF Products only compounds this risk to these species because PFAS can cause damage to the liver and immune system in animals and has been shown to damage cell structure and organelle functions in plants.

108.    Natural resource injuries to biota in the State negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

109.    PFAS contamination attributable to Defendants' AFFF Products has reached and adversely affected biota in the State, such as fish and osprey that live in and depend on surface water bodies contaminated with PFAS from AFFF Products.

110.    Fish sampled in December 2020 from Lake Worth—situated within the city limits of Fort Worth, Texas, in Tarrant County—showed concentrations of nineteen PFAS compounds: PFOS, PFOA, PFBA, PFPeA, PFHxA, PFNA, PFDA, PFUdA, PFDoA, PFTrDA, PFTeDA, PFBS, PFPeS, PFHxS, PFHpS, PFNS, PFDS, FOSA-1, and 6:2FTS. In 2022, fish sampled

contained concentrations of PFHpA and 8:2FTS, in addition to the 19 PFAS previously detected in 2020.

111.     Additionally, fish sampled in December 2021, January 2022, and November 2023 from Lower Leon Creek in Bexar County were contaminated with PFAS. The Texas Department of State Health Services concluded that the PFAS contamination in the fish could be attributed to AFFF used at Lackland Air Force Base and Kelley Air Force Base (known as Joint Base San Antonio), which are adjacent to the Lower Leon Creek.

112.     Specifically, samples of four freshwater fish species that are consumed by Texans showed PFAS contamination. For example, fillets of Blue Catfish taken near the Naval Air Station Joint Reserve Base Forth Worth ("Base") evidenced contamination of PFAS, with mean concentrations of PFOS at 1,857.5 ng/kg, PFOA at 15.8 ng/kg, and PFDA at 467.6 ng/kg, among others. Channel Catfish samples taken near the Base showed mean concentrations of PFOS at 1,112.3 ng/kg, PFOA at 23.1 ng/kg, and PFDA at 327.5 ng/kg. Fillets of Largemouth Bass also showed contamination of PFAS, with mean concentrations of PFOS at 14,209.4 ng/kg, PFOA at 13.2 ng/kg. and PFDA at 693.6 ng/kg. Finally, samples of Smallmouth Buffalo had mean concentrations of PFOS at 8290 ng/kg, PFOA of 19.3 ng/kg, and PFDA 242.7 ng/kg.

113.     PFAS attributed to AFFF has also been detected in eastern oysters, redfish, gafftopsail catfish, and spotted seatrout found in Galveston Bay.

114.      Investigation of AFFF Products-related contamination in biota in the State is ongoing.

## C.     Manufacturer Defendants' History of Manufacturing and Selling AFFF Products

115.     3M began to produce PFOS and PFOA by electrochemical fluorination in the 1940s. By the 1960s, 3M used its fluorination process to develop AFFF.

116.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

117.    Arkema's predecessors supplied fluorosurfactants (e.g., PFOA) used to manufacture AFFF beginning in the 1970s. Ciba Corporation ("Ciba") supplied fluorosurfactants used to manufacture AFFF beginning in the 1970s. Dynax supplied fluorosurfactants used to manufacture AFFF beginning in the 1990s. Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants used to manufacture AFFF. Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it supplied fluorosurfactants used to manufacture AFFF. Following Chemours's spinoff from Old DuPont, Chemours supplied fluorosurfactants used to manufacture AFFF.

118.    At varying times, AGC Chemicals, Clariant, and Old DuPont supplied fluorochemicals used to make AFFF.

119.    From the 1960s through 2001, the U.S. Department of Defense purchased AFFF exclusively from 3M and Tyco/Ansul.

120.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. In communications with EPA at that time, 3M stated that it had "concluded that . . . other business opportunities were more deserving of the company's energies and attention." In its press release announcing the phase-out, 3M stated "our products are safe" and that 3M's decision was "based on [its] principles of responsible environmental management." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." 3M made no mention in its press releases or regulatory statements

of the risks to human health and the environment posed by the chemicals, although those risks were known to it at the time.

121. After 3M exited the AFFF market, the remaining Manufacturer Defendants continued to manufacture and sell AFFF Products that contained PFAS. Indeed, Old DuPont saw an opportunity to grab a larger share of the AFFF market when 3M exited, although Old DuPont had decades of evidence that PFAS were highly toxic and dangerous to human health and the environment.

122. Manufacturer Defendants advertised, offered for sale, and sold AFFF Products to federal, state, and territory government entities, including the military, counties, municipalities, airports, fire departments, and/or other governmental or quasi-governmental entities, for use in the State.

123. 3M's AFFF Products were created using an electrochemical fluorination process and contain PFAS. The remaining Manufacturer Defendants' AFFF Products were created using a telomerization process and contain or break down into PFOA. AFFF Products manufactured by Manufacturer Defendants other than 3M are fungible and lack traits that would make it possible to identify the product as being manufactured, distributed, or sold by a particular Manufacturer Defendant. Due to this fungibility, Manufacturer Defendants are in the best position to identify the original manufacturer of the AFFF Products released at any particular site. Any inability of the State to identify the original manufacturer of the specific AFFF Products released into the State's natural resources in particular instances at particular sites is a result of the fungibility of the products and not as a result of any action or inaction by the State.

124. Manufacturer Defendants knew their customers stored large stockpiles of AFFF Products. In fact, Manufacturer Defendants marketed their AFFF Products by promoting their long

shelf life. Even after Manufacturer Defendants fully understood the toxicity of PFAS—and their injurious impacts when released into the environment—Manufacturer Defendants concealed the true harmful nature of PFAS. Even while Manufacturer Defendants phased out production or transitioned to other formulas, they did not advise their customers that they should not use AFFF Products that contained PFAS or otherwise reveal the dangers posed by the AFFF Products.

125.    Manufacturer Defendants further did not attempt to remove their harmful products from the market. Manufacturer Defendants did not warn the State or consumers that the use of AFFF Products with PFAS would harm the environment, endanger human health, or result in substantial costs to investigate and clean up contamination and damage to other natural resources.

126.    Accordingly, PFAS from AFFF Products are still released into the environment today.

127.    Likewise, for many years after their original sale, AFFF Products were still being applied directly to the ground and washed into sediments, soils, and waters of the State, harming the environment and endangering human health. Manufacturer Defendants never advised their customers that they needed to properly dispose of their stockpiles of AFFF Products, and they did not advise them on how to properly dispose of AFFF Products.

128.    Manufacturer Defendants' failure to ensure that their customers properly disposed of AFFF Products has pushed the monetary burden of remediation and disposal onto the State.

D.   **Manufacturer Defendants Knew, or Should Have Known, That Their AFFF Products Containing PFOS, PFOA, and Their Precursors Were Harmful to the Environment and Human Health**

   i.   **3M Knew, or Should Have Known, of the Harm Caused by PFAS, and 3M Concealed Negative Information About These Chemicals from Regulators and Users of AFFF Products**

129.   3M has known for decades that the PFAS contained in its AFFF are toxic and adversely affect the environment and human health. By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

130.   3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

131.   As early as 1963, 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal.

132.   By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

133.   By no later than 1970, 3M knew that its PFAS products were hazardous to marine life. Still, 3M refused to take any steps to mitigate these hazards. In fact, around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

134.   In 1975, 3M found there was a "universal presence" of PFOA and/or PFOS in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS, a scenario 3M discussed internally but did not share outside the company. This finding also

reasonably alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying, as these characteristics would explain the presence of PFAS in human blood.

135.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about the health effects of PFAS.

136.    In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

137.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

138.    According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

139.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

140.    In 1984, 3M's internal analyses proved that fluorochemicals were likely bioaccumulating in 3M's employees. Despite its understanding of the hazards associated with the PFAS in its products, 3M suppressed scientific research on the hazards associated with them and

mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

141.     At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

142.     Thus, 3M deceived others and hid the negative effects of PFAS. For example, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, without limitation: (1) 3M's tactics to prevent research into the adverse effects of its PFOS; (2) 3M's submission of misinformation about its PFOS to EPA; (3) 3M's failure to disclose substantial risks associated with its PFOS to EPA; (4) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; (5) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and (6) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

143.     By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 parts per billion, at a time when 3M was well aware that the average level of PFOS being found in the blood of the general population of the United States was approximately 30 times higher than this "safe" blood level, but 3M did not disclose that information to regulatory authorities or the public.

144.     3M knew, or should have known, that its AFFF, in its intended use would release PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State due to their toxicity. Such knowledge was accessible to 3M, but not to the State until

3M's acts and omissions came to light, and the State developed its own understanding of the toxicity of PFAS.

145.    Despite its knowledge of the risks associated with exposures to its PFAS products, when 3M announced it would phase out its PFOS, PFOA, and related products (including AFFF) in 2000, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

### ii.    Old DuPont Knew, or Should Have Known, of the Harms Caused by PFOA, and It Concealed Its Knowledge from Regulators and Users of AFFF Products

146.    In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical production applications, including household products, like Teflon®, and quickly thereafter, developed an understanding of the dangers of using these chemicals.

147.    During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that Teflon®, which was manufactured using PFOA and other PFAS, and related industrial facilities emitted and discharged PFOA and other PFAS in large quantities into the environment and that many people had been exposed to its PFAS, including via public and private drinking water supplies.

148.    Old DuPont scientists issued internal warnings about the toxicity associated with PFOA as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

149.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health

effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

150.     By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFOA building up in the blood of its exposed workers (and was, thus, "biopersistent"), but those workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State, at that time.

151.     The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

152.     Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with Teflon®, two—or 25%—had children with birth defects in their eyes or face and at least one had PFOA in the umbilical cord.

153.     While Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, Old DuPont concealed the results of the blood sampling study it had conducted on its own workers. At this time, Old DuPont was also aware that PFAS could contaminate the surrounding environment, creating another pathway to human exposure.

154.     After obtaining data on PFAS releases from its facilities and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware in 1984 to discuss health and

environmental issues related to PFOA in particular. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They accepted Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position." Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment in order to continue profiting from manufacturing PFAS and selling AFFF Products.

155.    Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, began to sell AFFF after 3M announced its phase-out of PFOA and PFOS in 2000 (due to 3M's knowledge of the compounds' toxicity and threats of further enforcement action by EPA).

156.    In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA in violation of TSCA and RCRA. Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

157.    A 2008 letter from Old DuPont's shareholders to the Securities and Exchange Commission ("SEC") explained that, while Old DuPont's management asserted that studies it had funded showed no harm to human health from PFOA exposure, Old DuPont's own Epidemiology

Review Board ("ERB") adamantly disagreed with this conclusion and sent emails to the company lambasting the "no health effects" characterization. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

158.    In 2008, Old DuPont literature was quoted in an Industrial Fire World magazine article regarding AFFF, stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA." Old DuPont knew these statements were false but did not correct them.

159.    Old DuPont replaced PFOA in its manufacturing processes with a chemical process involving another PFAS, HFPO-DA, which is now used by Chemours. Yet GenX has also contaminated groundwater, surface water, and soil around Chemours's manufacturing facilities, including through air emissions and discharges to surface water, including the Ohio River.

### iii.    The Remaining Manufacturer Defendants Knew, or Should Have Known, of the Harm Caused by the Release of PFOA from Their AFFF Products

160.    The remaining (non-3M) Manufacturer Defendants knew, or should have known, that, in their intended and common use, their AFFF Products containing PFAS would harm the environment and human health.

161.    The remaining Manufacturer Defendants knew, or should have known, that their AFFF Products released PFAS that would dissolve in water; reach water systems and the environment in the State; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the State due to their toxicity.

162.     Information regarding PFAS was readily accessible to each of the remaining Manufacturer Defendants for decades. Each is an expert in the field of AFFF Products' manufacture and the materials containing PFAS that are needed to manufacture AFFF Products, and each has detailed information and understanding about the PFAS in AFFF Products. The State, by contrast, did not have access to such information.

#### iv.     Old DuPont Worked in Concert with Other Manufacturer Defendants and the Firefighting Foam Coalition to Mislead States, Regulators, and Consumers

163.     The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. Over time, National Foam, KFI, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Members") joined the group, along with others in the industry. Unlike 3M's PFOS-based AFFF, FFFC Members' AFFF used PFOA, which FFFC Members claimed was a far safer option.

164.     Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors released from AFFF Products but did not share that information with the general public or governmental entities, including the State.

165.     FFFC Members worked together to protect their AFFF Products from scrutiny by, among other things, coordinating their messaging on PFOA's toxicological profile and on their AFFF Products' contribution of PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities' learning the truth about the harms of PFOA to the environment and human health. FFFC Members regularly published newsletters promoting their AFFF Products and attended trade group conferences to disseminate misleading messaging.

166. FFFC Members' coordinated messaging and publishing efforts were meant to undermine and dispel concerns about the impact AFFF Products had on the environment and human health. They worked in concert to conceal the known risks of their AFFF Products from the general public and government entities, including the State.

167. FFFC Members repeated the same messaging for years, with the result that only one PFAS chemical—PFOS, which FFFC Members' products did not contain—was taken off the market.

168. FFFC Members knew that their messaging regarding AFFF Products was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF Products and that PFOA presented a similar threat to human health and the environment as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities, including the State because FFFC Members withheld their knowledge about the dangers of PFAS and AFFF Products.

169. As explained by the federal court in South Carolina overseeing the multidistrict litigation related to PFAS contamination from AFFF Products (the "AFFF MDL Court") (record citations omitted and emphasis added):

> 1. In its effort to distinguish telomer-based AFFF from 3M's AFFF, the FFFC stated that "telomer based AFFF does not contain PFOS and cannot be oxidized or metabolized into PFOS." This was something of a red herring because PFOS was exclusively manufactured by 3M. But 3M AFFF also contained PFOA, another highly persistent C8 chemical, and there was concern with any product that allowed PFOS or PFOA to be released into the environment.

> 2. The FFFC recognized the risk posed by any association of telomer AFFF with PFOA and stated to the EPA during the September 28, 2001 meeting that telomer-based AFFF "does not contain any PFOA-based product." **What the FFFC notably omitted to address, however, was whether telomer-based AFFF degraded in the environment to PFOA.**

170.    The AFFF MDL Court further explained that "[d]espite internal industry communications reflecting knowledge that telomer-based AFFF degraded to PFOA, the FFFC publicly asserted that 'telomer based fire-fighting foams are not likely to be a source of PFOA in the environment.'"[36]

### v.    Kidde plc, KFI, UTC F&S, and UTC Were Aware of the Dangers of AFFF

171.    KFI and predecessor entities operating the National Foam Business were members of the FFFC, and their main supplier, DuPont, was a founding member. Anne Regina, commonly referred to as the "Queen of Foam," was an executive who worked in the National Foam Business for more than 40 years, including the entire period KFI was owned by UTC. Ms. Regina was a key employee of KFI during the period that KFI was owned and controlled by UTC.

172.    By 2001, Ms. Regina and other key players in the National Foam Business had voluminous data on PFAS risks. The AFFF MDL Court explained the following, specifically in reference to "Kidde/National Foam" and Ms. Regina (record citations omitted):

> 3.    Defendant Kidde/National Foam claimed it did not have "actual knowledge until years after the government that its MilSpec AFFF even contained PFOA or components that may degrade to PFOA." Record evidence indicates a material factual dispute on that issue. Kidde executive Anne Regina stated in a March 7, 2001 internal email, titled "Foam Nasties," that there was a "common understanding" that telomer AFFF degrades and can produce PFOA. Another Kidde executive, John Dowling, stated in an April 18, 2001 email titled "EPA meeting: comments," that he feared that "[o]nce a witch hunt starts over bioaccumulation" with 3M AFFF, "it is inevitable that that attention will turn to telomer AFFF. He acknowledged that Kidde's AFFF "will degrade in the environment" to PFOA. Another Dowling email in 2002 stated that chemists "with knowledge of telomer structure and formulation are aware that telomer AFFF could degrade to PFOA.[37]

---

[36] *In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. MDL 2:18-1\4N-2873-RMG, 2022 WL 4291357, at *13 (D.S.C. Sept. 16, 2022) ("AFFF MDL").

[37] *In re Aqueous Film-Forming Foams Prod. Liab. Litig.,* No. MDL 2:18-MN-2873-RMG, 2022 WL 4291357, at *14 (D.S.C. Sept. 16, 2022).

173.    At the time of the proposed acquisition of Kidde plc in 2005, UTC was aware of the serious potential human health and environmental risks posed by AFFF Products. Upon information and belief, UTC was well aware of the concern that the telomer-based AFFF Products manufactured by Kidde plc and its subsidiaries such as KFF, would degrade into PFOA in the environment. Nevertheless, UTC not only pursued the acquisition of Kidde plc, but sought to expand the market for AFFF Products.

174.    As of January 26, 2007, two months prior to the merger between KFF and KFI effectuated by UTC in March 2007, KFF used DuPont's PFAS surfactants in the National Foam AFFF formulation. Despite KFF's awareness of the EPA's PFOA Stewardship Program to phase out products containing PFOA, KFF continued to market its AFFF Products. UTC, which then owned KFF, was aware of the risks as well.

175.    Certain key employees of the National Foam Business who were in regular contact with UTC during the period 2005-2013, were also active participants in the FFFC. Indeed, a Kidde plc employee personally attended the organizational meeting of the FFFC and was fully aware of the steps taken by the FFFC so that the EPA would not include telomer-based AFFF in the PFOA enforceable consent agreement ("ECA") process the EPA was conducting with the AFFF industry. The ECA process eventually led to an industry-wide agreement with EPA in 2006 to phase out PFOA manufacturing by 2015 under the PFOA Stewardship Program.

176.    UTC also was well aware of the scheme by the FFFC and FFFC members—including KFI and its predecessors—to defraud, actively hide, or negligently fail to provide relevant information regarding AFFF foams to EPA and other regulators during the ECA process. The FFFC and its members misled EPA and other regulators into believing that telomer AFFF foams were *only* made with non-PFOA surfactants. As a result of this deception, the PFOA

Stewardship Program only required the FFFC Members to phase out of PFOA and any precursors that could break down into PFOA, but did not require them to phase out of telomer-based products that included different harmful PFAS.

177.    UTC employees played an active role in attempting to capture AFFF market share, as both members of the FFFC and independently, by continuing to conceal the risks telomer-based AFFF posed. KFI, its predecessors, and UTC are responsible for the misleading statements and conduct of the FFFC, which they endorsed and supported.

178.    Indeed, the AFFF MDL Court found that in a "2008 email exchange, two employees discussed the FFFC's claim to the U.S. Department of Defense that telomer-based products were made with C6 surfactants rather than C8 surfactants," and "[t]hey agreed this claim was untrue and was likely done to distinguish telomer AFFF from 3M's discredited AFFF."

179.    This pattern of deception continued unabated during the period UTC owned and controlled the National Foam Business. For example, in 2011, at a time when KFI had become a leader of the domestic foam and hose supplier sector, KFI advised its customers that its telomer-based fluorinated surfactants were not made from PFOA-based chemicals and no PFOA-based product was added in the manufacturing process, thus perpetrating the misinformation on its own customers. The AFFF MDL Court noted this deception and sharply criticized KFI in a September 2022 ruling denying summary judgment.

180.    UTC F&S and its predecessors and affiliates had long known about viable alternatives to the harmful longer chain surfactants like PFOA. UTC F&S's predecessors, Angus and National Foam, were aware of the EPA's goal of phasing out PFOA, were aware of the PFOA Stewardship Program, and were aware that several of their suppliers were participating in the

PFOA Stewardship Program, in which suppliers of PFOA-based raw material did not expect to manufacture those raw materials after 2015.

**E.    KFI, Kidde Limited, Carrier Fire, Carrier Fire Americas, Carrier, and UTC Are Liable for All Historical Liabilities Related to the National Foam Business**

181.    The National Foam Business has been developing and marketing firefighting foams and delivery systems for more than a century. The National Foam Business began to manufacture AFFF in the 1970s. Based on the transactions described below, various entities, including KFI, Kidde Limited, Carrier Fire, Carrier Fire Americas, Carrier, and UTC became liable for harms caused by the AFFF Products manufactured by the National Foam Business.

182.    From the 1970s to 1997, the National Foam Business was owned by National Foam, Inc., which was also known at various times as Chubb National Foam, Inc. and National Foam System, Inc. The National Foam Business was also indirectly owned by a number of different corporate parents throughout this period, which include Philadelphia Suburban Corporation, Enterra Corporation, Racal Electronics plc, Chubb Security plc, and Williams Holdings plc ("Williams Holdings").

183.    In 2000, Williams Holdings elected to demerge two of its subsidiary entities, Chubb plc and Kidde plc. In connection with that transaction, Kidde plc assumed the AFFF liabilities related to the National Foam Business in connection with the demerger.

184.    In 2000, 3M made the announcement that it would no longer manufacture AFFF Products. UTC saw a significant business opportunity created by 3M's withdrawal from the marketplace, and in 2003, Kidde plc and Chubb plc became acquisition targets for UTC.

185.    On April 1, 2005, through a series of stock purchases by UTC and its subsidiaries, Kaysail Limited (a subsidiary of UTC) came to own 100% of Kidde plc.

186.     UTC paid $3.1 billion to acquire Kidde plc, which included the assumption of $520 million of Kidde plc debt (the "2005 Acquisition"). According to the corresponding purchase price allocation detail for the 2005 Acquisition as reported in UTCs Form 10-K filed with the SEC for fiscal year 2005, the assets acquired by UTC were worth $4.2 billion. That $4.2 billion included approximately $966 million for intangible assets, such as intellectual property and over $2 billion for goodwill.

187.     At the time of the 2005 Acquisition, Kidde plc was the parent of KFF (f/k/a National Foam, Inc.) and its AFFF business. As described above, Kidde plc had assumed the historical AFFF liabilities, and its affiliates also remained liable for the historical AFFF claims. At the time UTC completed its acquisition of Kidde plc, 100% of historical AFFF liability for the National Foam Business was housed within KFF, and several billions of dollars remained available, at that time, to satisfy claims concerning the National Foam Business.

188.     Following the acquisition of Kidde plc, KFF became a wholly owned subsidiary of UTC.

189.     According to UTCs Form 10-K for 2005 ("2005 UTC Form 10-K"), UTC created a new fire and security business segment ("UTC F&S Business") in the second quarter of 2005, following its acquisition of Kidde plc. Upon information and belief, UTC F&S was the owner and operator of the UTC F&S Business, which included UTC F&S Americas.

190.     The 2005 UTC Form10-K explains that the UTC F&S Business "includes our former Chubb segment and Kidde's industrial, residential and commercial fire safety businesses" but excludes "the aircraft fire protection systems business, which is included in the Hamilton Sundstrand segment." The 2005 UTC Form 10-K further explains that the UTC F&S Business "provides its products and services under Chubb, Kidde, Lenel and other brand names and sells

directly to the customer as well as through manufacturers' representatives, distributors and dealers."

191.    UTC's integration of Kidde plc's commercial fire and safety business into the UTC F&S Business did not extinguish any tort liabilities or eliminate assets available to satisfy AFFF claims. The UTC F&S Business continued Kidde plc's fire and security business—i.e., there was a continuation of normal business operations, including a continuity of physical location, assets, human capital, and general business operations. UTC was the ultimate shareholder of all entities that continued Kidde plc's fire and security business, including the production of AFFF Products.

192.    On March 8, 2007, UTC caused a merger between KFF and KFI. As a result of the merger, KFI assumed KFF's AFFF business and liabilities, which included all historical liability for the National Foam Business. Following the merger, KFF ceased to exist as a separate entity.

193.    Following the merger and until 2013, KFI marketed and sold AFFF Products in the United States under the "National Foam" brand.

194.    On June 28, 2013, UTC directed KFI's sale of the National Foam Business to Lloyds Development Capital, a UK based arm of the Lloyds Banking Group.

195.    Following the 2013 sale of the National Foam Business, operational supervision of KFI was transferred to one of UTC's subsidiaries, Carrier Corporation. UTC wholly controlled KFI through its Carrier entities. KFI employees were hired, managed, promoted, and fired, only by Carrier Corporation employees or their affiliates. Therefore, UTC exerted direct control over KFI's daily business operations.

196.    On June 9, 2019, UTC announced its plan to merge with Raytheon. Pursuant to the merger, Raytheon required that UTC spin-off two of its business segments, the Otis reporting segment and Carrier reporting segment, to create two new companies, Otis Worldwide Corp., and

Carrier. On April 3, 2020, once UTC had distributed 100% of the Otis Worldwide Corp. and Carrier Stock, the separation was complete.

197.    Following the merger, UTC's name changed to Raytheon, n/k/a RTX Corporation.

198.    From April 3, 2020, to today, Carrier has been the ultimate parent company of KFI.

199.    Under the 2020 Separation Agreement, Carrier accepted and assumed all Carrier liabilities. Specifically, Carrier affirmatively assumed, and is obligated to indemnify UTC for "all Carrier Liabilities, regardless of when or where such Carrier Liabilities arose or arise."

200.    Included in all "Carrier Liabilities" are all of the AFFF liabilities arising out of the National Foam Business. Section 2.3(a) of the 2020 Separation Agreement provides that "Carrier Liabilities" includes "all Liabilities" arising from litigation, including "Environmental Liabilities," to the extent that the underlying facts arise out of "Carrier Business." Further, Article 1 of the agreement provides that "Carrier Business" includes the reporting segment that contained the National Foam Business. Therefore, pursuant to the 2020 Separation Agreement, Carrier assumed all of the AFFF liabilities.

201.    Pursuant to the 2020 Separation Agreement, Carrier also agreed to indemnify UTC for all "Carrier Liabilities." The indemnification includes all claims, whether or not they arose before, at, or after the effective date. Therefore, Carrier's indemnification of UTC includes all National Foam Business Liabilities going as far back as the 1970s.

202.    On May 14, 2023, in anticipation of potential settlements in the AFFF MDL lawsuits, Carrier issued a press release purporting to explain its reasons for cutting off financial support to KFI, Carrier claimed that it was not responsible for the AFFF activities of KFI and not liable for KFI's debts under law. These statements are directly contradicted by Carriers contractual

commitments under the 2020 Separation Agreement, under which Carrier assumed all of KFI's AFFF liabilities.

203. By cutting KFI off from financial support, Carrier drove the entity to file for bankruptcy on May 14, 2023.

204. At the time of the 2020 Separation Agreement, UTC was already facing significant AFFF liability, and had been named as a defendant in numerous cases alleging serious human health effects and environmental harm resulting from AFFF. Accordingly, upon information and belief, UTC, in advance of its merger with Raytheon, instituted a series of transactions with the goal of transferring all legacy AFFF liabilities to Carrier and KFI. Thus, pursuant to the 2020 Separation Agreement, Carrier has assumed all the AFFF liabilities of Kidde Limited f/k/a Kidde plc, UTC F&S Americas, UTC F&S, and KFI.

205. In addition, UTC is liable based on its direct conduct and control of KFI during relevant times. Between 2005 and 2013 (specifically inclusive of the 2007 merger and through the sale of the National Foam Business in 2013), UTC, at all relevant times, operated the UTC F&S Business and KFI, including the National Foam Business, as a single business enterprise and in a manner inconsistent with KFI's operation as an autonomous company.

206. In fact, UTC exercised complete control over KFI. During the same period, UTC was well aware of the risks of AFFF but did nothing to mitigate the mounting liability being incurred by KFI. Instead, UTC—aware that KFI was misleading regulators, customers, and the public as to the material risks of the AFFF Products that KFI was selling—directed and required KFI to expand its market share, facilitating such misconduct to benefit UTC financially.

207. After UTC's sale of its National Foam Business in 2013, the operational supervision of KFI was moved within the business structure of Carrier Corporation, a company that had been acquired by UTC in 1979.

208. By 2014 and through April 2020, KFI functioned as part of the UTC F&S Business. Carrier, following the sale of the National Foam Business, exercised control of KFI in many ways.

209. UTC continued to dominate KFI, through Carrier entities, in a manner that lacked respect for formal corporate separateness. For example, KFI employees were hired, managed, promoted, and fired not by KFI superiors, but by employees of Carrier Corporation or its affiliates.

210. Similarly, while a subsidiary of UTC, KFI was governed and directed by individuals who held positions in parent companies and afforded those companies significant influence over KFI.

**F.     AFFF Products Have Resulted in PFAS Contamination in the State, Including Sources of Drinking Water, and Public Lands, and Manufacturer Defendants Are Liable for Costs to Remediate and Restore Contaminated Natural Resources**

211. The State's natural resources have been contaminated with PFAS by the use of AFFF Products, and investigation of that contamination is ongoing. Manufacturer Defendants' designing, manufacturing, marketing, and selling of AFFF Products in the State, including to the U.S. military, have been substantial factors in causing PFAS contamination and its injuries to the natural resources of the State. As investigation continues, additional locations are identified, and on- and offsite AFFF Products-related contamination is delineated, it is expected that significant further PFAS contamination from AFFF Products will be discovered.

212. Although the contamination from Manufacturer Defendants' AFFF Products is widespread in the State, the following sites offer examples of the extent such contamination: (1) Reese AFB; (2) Sheppard AFB; (3) Dyess Air Force Base ("Dyess AFB"); and (4) Corpus Christi NAS.

213.    For example, samples taken at or near Reese AFB, located at 9801 Reese Boulevard North, 300, Lubbock, Lubbock County, Texas 79416, reveal PFAS contamination at and/or near the site. Reese AFB operated as a training school for over 25,000 pilots prior to its closure in 1997. Air Force personnel used AFFF at the site between the early 1970s and 1997, and investigations in 2019 have detected contamination in the site's groundwater and drinking water.

214.    The PFOS concentration in groundwater at or near Reese AFB exceed 1,800 ppt and the PFOA concentrations exceeded 5,400 ppt. Additionally, PFOS and PFOA have also been detected in concentrations reaching 1,580 ppt and 3,250 ppt, respectively, in the drinking water at Reese AFB. These concentrations far exceeded the EPA's health advisory limits ("HALs") and the TCEQ's PCLs for PFOS and PFOA. Finally, PFOA has been detected at concentrations as high as 59.3 mg/L in nearby residents' blood.

215.    Sheppard AFB, located at 1810 J Ave., Sheppard AFB, Wichita Falls, Wichita County, Texas 76311, also has PFAS contamination attributed to confirmed and suspected AFFF releases. The Air Force began operations at Sheppard AFB in 1948. The site now serves as the largest training base in Air Education and Training Command for pilots.

216.    In 2019, ten areas with confirmed or suspected AFFF releases were sampled. All ten areas showed PFAS contamination in the groundwater and soil. Groundwater showed contamination of PFOS as high as 550,000 ppt, and PFOA as high as 140,000 ppt. One of the ten areas sampled at Sheppard AFB was a former fire training area ("Former Fire Training Area No. 3"). Samples from Former Fire Training Area No. 3 revealed surface soil levels of 7.2 mg/kg PFOS and 1.8 mg/kg PFOA, exceeding the Residential Surface Soil Tier 1 Residential PCL.

217.    Another area sampled within Sheppard AFB was the Strategic Air Command Alert Ramp Fire site. In 2011, an unknown amount of AFFF was used to extinguish a fire at the

northernmost part of the site. PFOS and PFOA were detected in the soil and groundwater of this area.

218.    Additionally, off-site sampling of drinking water near Sheppard AFB has revealed PFAS contamination, including detections of PFOS, PFOA, PFBS, PFBA, PFPeA, PFHxA, PFHxS, and PFHpA, in nearby drinking water.

219.    Moreover, Dyess AFB, located at 7 Lancer Loop, Abilene, Taylor County, Texas 79607, is yet another military site at which the State's natural resources have been contaminated by AFFF use. As part of the site's operations, the Air Force conducted training exercises in fire pits as often as sixteen times per year. Unknown amounts of AFFF were used to extinguish fires during these training operations.

220.    In 2017 and 2018, fifteen areas with known or suspected AFFF releases were sampled for PFAS contamination. In 2022, a Site Inspection report revealed that all fifteen areas showed elevated PFOS and PFOA concentrations in the groundwater and/or surface water.

221.    One of the fifteen areas tested within Dyess AFB was the North Diversion Ditch. The ditch was constructed in 1955, and receives drainage from hangars, spray testing areas, and the former fire station. Surface water at or near the ditch showed a combined PFOS and PFOA concentration reaching as high as 25,430 ppt.

222.    Another area tested within Dyess AFB was a testing area known as "Spray Test Area No. 1." This area is located in the northern part of AFB. AFFF was used in this area—dating back to 1980—for time and distance testing of fire engines. Sampling conducted here revealed groundwater contamination reaching as high as 448,200 ppt for PFOS and PFOA combined.

223.    AFFF used during operations at Dyess AFB has caused off-base drinking water contamination. Off-site drinking water samples show a combined concentration of PFOS and PFOA reaching up to 830.2 ppt, and PFBS reaching 2,480 ppt.

224.    Finally, Corpus Christi NAS, located at 11001 D St., #101, Corpus Christi, Nueces County, Texas 78418, is another site at which the State's natural resources have been contaminated by AFFF in military activities. Corpus Christi NAS is also near three bodies of water—Oso Bay, the Laguna Madre, and Corpus Christi Bay.

225.    For example, a Site Inspection conducted in 2022 and 2023, investigated eleven areas with known or suspected AFFF releases for PFAS contamination. In one area known as "DON Hangar 42 and CCAD Hangars 43, 44, 45, 46, and 47," PFOA and PFOS was detected in all groundwater samples taken, with maximum concentrations reaching 22,700 ppt and 2,810 ppt, respectively. PFBS PFHxS and PFNA were also detected in this area, with concentrations reaching 11,200 ppt, 44,000 ppt, and 21.6 ppt, respectively.

226.    In the "Former Fire-Fighting Training Areas," PFOS, PFOA, PFBS, PFHxS, and PFNA were detected in the soil, with PFOS and PFOA reaching concentrations of 549,000 ppt and 21,800 ppt.

227.    Additionally, off-site sampling of drinking water near Corpus Christi NAS has revealed PFOS and PFOA contamination in nearby drinking water.

228.    As investigation of AFFF Products-related contamination continues, additional contaminated areas will be discovered on a location-by-location basis. Such investigation is necessary to ascertain the scope of AFFF Products-related contamination and to return the affected natural resources to levels that are safe for human health and the environment and to the condition they were in prior to the impact of these contaminants.

229.     Manufacturer Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with PFAS from AFFF Products, as well as for the State's loss of past, present, and future use of such contaminated natural resources.

230.     The PFAS contamination in groundwater and surface water is likewise impacting the State's drinking water sources. Manufacturer Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water adversely impacted by PFAS from AFFF Products in the State.

## G.     Old DuPont's Multi-Step, Years-Long' Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities

231.     In or about 2013, Old DuPont began planning a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy liabilities—especially those arising from its historical use of PFOA and other PFAS.

232.     Old DuPont's potential cumulative liability related to PFOA and other PFAS, including AFFF that contained PFAS, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

233.     For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. By 2013, Old DuPont knew it was facing an avalanche of claims related to its PFAS business.

234.     For example, a 2012 study—funded by Old DuPont pursuant to a 2005 class action settlement—confirmed "probable links" between PFOA exposure to and several serious human diseases: medically diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

235.    As a result, more than 3,500 class members with one or more of those linked diseases filed personal injury claims against Old DuPont. Under the terms of the 2005 class settlement, Old DuPont had agreed not to contest the fact that the class members' exposure to PFOA could have caused each of the linked diseases, significantly limiting Old DuPont's available defenses to liability.

236.    Anticipating significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

237.    At the same time, Old DuPont and The Dow Chemical Company ("Old Dow") were discussing a possible "merger of equals."

238.    But no rational merger partner, including Old Dow, would agree to a transaction that would expose it to the substantial PFAS and environmental liabilities that Old DuPont faced.

239.    In greater detail, the restructuring scheme was implemented as follows.

**i.    Step 1: The Chemours Spinoff**

240.    The first step in Old DuPont's scheme was to transfer its performance chemicals business, which included Teflon®, Stainmaster, and other products associated with Old DuPont's historic use of PFOA ("Performance Chemicals Business") into its wholly owned subsidiary, Chemours. Then, on July 1, 2015, Old DuPont spun off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

241.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

242.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

243.    Chemours, in turn, broadly assumed Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business and other unrelated business lines, set forth in detail in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

244.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date," which includes Old DuPont's historic liabilities relating to and arising from its marketing and operation of the Performance Chemicals Business, such as its liabilities arising from PFAS.

245.    In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

246.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million. In total, Old DuPont extracted approximately $3.9 billion from Chemours.

247.    Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling

approximately $3.995 billion, on May 12, 2015. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours.

248.    At the end of 2015, Chemours reported a total net worth of just $130 million. But Chemours's estimated liabilities—which at the time totaled $6.168 billion—vastly underestimated the true value of its liabilities, including the PFAS liabilities it had assumed from Old DuPont, which Chemours knew or should have known would cost it billions of dollars.

249.    Old DuPont dominated Chemours during negotiation and execution of the Chemours Separation Agreement. Old DuPont's conduct was so egregious that in May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. See The Chemours Company v. DowDuPont, et al., C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

250.    In its Amended Complaint—which was verified by Chemours's current Chief Executive Officer, Mark Newman—Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities," including litigation liabilities arising out of Old DuPont's historic use of PFOA and other PFAS.

251.    Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

252.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

### ii.    Step 2: The Old Dow/Old DuPont "Merger"

253.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS liabilities that it had accrued over several decades.

254.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

255.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive penalties and punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

256.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "DowDuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

257.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "DowDuPont Merger Agreement") that provided for the formation of a new holding renamed first as DowDuPont and then renamed again as DuPont de Nemours, Inc. (i.e., New DuPont), of which Old DuPont and Old Dow became wholly owned subsidiaries.

258.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have

infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

### iii.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

259.    Following the DowDuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company, frustrating Old DuPont's creditors, including with respect to its substantial PFAS liabilities.

260.    Old DuPont's assets were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

261.    DowDuPont then incorporated two companies (i) Corteva and (ii) New Dow. In accordance with the merger plan, each of these three companies received one of the three business divisions associated with Old DuPont's and Old Dow's historic assets, and was subsequently separated as an independent, publicly traded company.

262.    The mechanics of the separations are governed by the April 1, 2019, Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

263.    The DowDuPont Separation Agreement allocated the assets and liabilities primarily related to the respective business divisions between the three companies: DowDuPont retained the assets and liabilities associated with the Specialty Products Business and several "non-

core" business segments and product lines that once belonged to Old DuPont. Corteva received the assets and liabilities associated with the Agriculture Business; and New Dow received the assets and liabilities associated with the Materials Science Business.

264.    DowDuPont also "contributed" Old DuPont to Corteva, and Old DuPont remains a wholly-owned subsidiary of Corteva to this day.

265.    Pursuant to the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability for legacy liabilities arising from Old DuPont's historic use of PFOA and other PFAS and its former Performance Chemicals Business.

266.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva's express assumption of Old DuPont's historic liabilities includes all liability associated with PFAS. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the State's natural resources.

267.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

268.    On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

269.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

270.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

271.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont—once available to satisfy successful claims brought by potential plaintiffs such as

the State—and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

272. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have buried these details in an apparent attempt to hide from creditors, like the State, where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

273. In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's liabilities arising from its historic use of PFOA and other PFAS. And it is far from clear that either entity will be able to satisfy future judgments.

## IV.  CLAIMS

### COUNT I
### PUBLIC NUISANCE – COMMON LAW
### (ALL DEFENDANTS)

274. The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

275. Manufacturer Defendants created a public nuisance by manufacturing, marketing, and distributing AFFF Products in a manner that resulted in the contamination of the State's, property, and natural resources with PFAS.

276. PFAS contamination of the State's drinking water supplies, property and other natural resources endangers the health and safety of the State's citizens.

277. PFAS contamination of the State's property and natural resources further interferes with its citizens' use and enjoyment of these resources.

278. Manufacturer Defendants knew or should have known that PFAS are persistent, bioaccumulative, and toxic.

279.    Manufacturer Defendants knew or should have known that PFAS are released into the environment as a result of the use of their AFFF Products, and that this PFAS would migrate to and contaminate state property and natural resources.

280.    Manufacturer Defendants knew or should have known that their manufacture, sale, and distribution of AFFF Products would result in the contamination of the State's property and natural resources, including drinking water sources.

281.    The State has been damaged and continues to suffer damages as a result of Manufacturer Defendants' conduct. The State incurred and continues to incur costs to identify PFAS contamination from AFFF Products, identify ways to prevent PFAS from AFFF Products from contaminating additional natural resources, and remediate the State's natural resources that have been contaminated with PFAS from AFFF Products.

282.    The injury to the State's natural resources is especially injurious to the State in its proprietary and natural resource trustee capacities.

283.    The State is incurring and will incur costs to investigate, monitor, and remediate, and restore PFAS contamination from AFFF Products in its natural resources.

284.    Manufacturer Defendants are liable and subject to injunctive relief prohibiting the creation and continuance of said public nuisance, and the State is entitled to all direct and consequential damages from that nuisance. Manufacturer Defendants also are liable for any other relief that will abate and remediate the nuisance and its short-term and long-term effects to the State's property and natural resources.

285.    As described above, Corteva and New DuPont assumed Old DuPont's public nuisance liability in connection with the DowDuPont Separation Agreement.

286.    Kidde plc assumed all of the historical liabilities of the National Foam Business in connection with the Demerger Agreement in 2000. Kidde plc is therefore liable for this claim.

287.    In connection with the 2005 Acquisition, UTC purchased Kidde plc and used its assets to create UTC F&S, which therefore became the successor to Kidde plc and the historical liabilities of the National Foam Business. UTC F&S, along with its subsidiary, UTC F&S Americas, was directly involved in and controlled the operations of the National Foam Business. UTC F&S and UTC F&S Americas are therefore liable for this claim on this ground as well.

288.    UTC, through its ownership, control over and conduct associated with the National Foam Business, designed, manufactured, marketed, promoted, distributed, and/or sold AFFF Products throughout the United States and is thus liable on the State's public nuisance claim.

289.    On September 28, 2020, UTC F&S changed its name to Carrier Fire. Carrier Fire is the legal successor to UTC F&S's fire and security business and thus also liable for this claim.

290.    On October 1, 2020, UTC F&S Americas changed its name to Carrier Fire Americas. Carrier Fire Americas is the legal successor to UTC F&S Americas' fire and security business and thus also liable for this claim.

291.    Carrier assumed all the AFFF liabilities of Kidde plc, UTC, UTC F&S, UTC F&S Americas and KFI in connection with the 2020 Separation Agreement and is also liable for this claim.

## COUNT II
## NEGLIGENCE
## (ALL DEFENDANTS)

292.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

293.    Manufacturer Defendants owed a duty to the State to ensure that PFAS were not released as a result of the use of their AFFF Products and did not injure state property, drinking

water, groundwater, surface water, sediment, soils, biota, estuaries, and other natural resources in the State.

294.     Manufacturer Defendants owed a duty to the State to exercise due care in the research, design, formulation, handling, manufacture, marketing, sale, testing, labeling, use, distribution, promotion, and instructions for use of their AFFF Products containing PFAS.

295.     Manufacturer Defendants breached these duties in that they negligently, carelessly, and recklessly ignored research and designed, formulated, handled, manufactured, marketed, sold, tested, labeled, used, distributed, promoted, and instructed for use of AFFF Products when they knew, or should have known, that PFAS would (i) be released into the environment, and (ii) be released and contaminate the State's property and natural resources.

296.     Despite their knowledge that contamination with PFAS was the inevitable consequence of their conduct as alleged herein, Manufacturing Defendants, regardless of preliminary results of PFAS studies indicating the hazards of PFAS, failed to fully research the effects of PFAS on human health and the environment and failed to provide reasonable warnings or special instructions, failed to take other reasonable precautionary measures to prevent or mitigate such contamination, and affirmatively misrepresented the hazards of PFAS in their AFFF Products information and instructions for use.

297.     Through their negligent conduct in connection with the manufacture and sale of AFFF Products, and their failure to disclose the dangers to human health and the environment associated with PFAS, Manufacturer Defendants breached their duties to the State by unlawfully causing, permitting, or suffering to be thrown, run, drained, allowed to seep, or otherwise discharged into any of the waters of this State, materials containing PFAS that cause or tend to cause pollution of the State's waters, in violation of the Texas Water Code.

298.     As a direct and proximate result of Manufacturer Defendants' acts and omissions, the State has suffered and will continue to suffer monetary losses and damages in amounts to be proven at trial, including but not limited to investigation, remediation, treatment, monitoring, and restoration, rehabilitation, acquisition of the equivalent resources, and replacement costs and expenses for which Manufacturer Defendants are jointly and severally liable.

299.     As long as the State's natural resources remain contaminated with PFAS due to Manufacturer Defendants' conduct, the harm to the State continues.

300.     Manufacturer Defendants acted with willful or conscious disregard for the rights, health, and safety of the State's residents and the well-being of the State's property and natural resources, thereby entitling the State to an award of punitive damages.

301.     As described above, Corteva and New DuPont assumed Old DuPont's negligence liability.

302.     Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

## COUNT III
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

303.     The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

304.     The Defendants committed acts and omissions: (1) which, when viewed objectively from the Defendants' standpoint, at the time of the occurrences, involved an extreme degree of risk, considering the probability and magnitude of potential harm to others; and (2) of which Defendants had an actual, subjective awareness of the risk involved, but nevertheless proceeded

with conscious indifference to the State's rights, safety or welfare. TEX. CIV. PRAC. & REM. CODE § 41.001(11)(A)-(B).

305.    As described above, Defendants: either ignored studies indicating the harms of PFAS or failed to fully research the effects of PFAS and provide reasonable warnings or appropriate instructions to consumers regarding the use and disposal of its AFFF Products; failed to take other reasonable precautionary measures to prevent or mitigate PFAS contamination from its AFFF Products; and affirmatively misrepresented the hazards of PFAS in their AFFF Products information and instructions for use.

306.    When the Manufacturer Defendants' acts and omissions are viewed from an objective and subjective lens, it is clear the Manufacturer Defendants had an understanding of the risks of PFAS in their AFFF Products but chose to proceed with conscious indifference to the State's safety and welfare.

307.    The State's damages resulted from the Manufacturer Defendants' gross negligence, malice, and fraud, which entitles the State to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a).

308.    As described above, New DuPont and Corteva assumed Old DuPont's gross negligence liability.

309.    Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

### COUNT IV
### TRESPASS – COMMON LAW
### (ALL DEFENDANTS)

310.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

311.    Trespass is an unprivileged, intentional intrusion on land in the possession of another, which may arise from the release of chemicals causing contamination of the property.

312.    At all pertinent times, the State held exclusive possession in trust or otherwise owned land in the State contaminated by Manufacturer Defendants' AFFF products, which caused and continue to cause PFAS contamination of the State's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and public lands held in trust or otherwise owned by the State.

313.    At all times relevant to the present cause of action, Manufacturer Defendants, as designers, manufacturers, marketers, and sellers of AFFF Products containing PFAS, provided the AFFF Products that were used throughout the State, including on land owned by the State, that resulted in the contamination of air, soil, sediment, biota, surface water, estuaries, public lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State.

314.    Manufacturer Defendants affirmatively, unreasonably, voluntarily, and intentionally provided AFFF Products to entities in the State. It was reasonably foreseeable to the Manufacturer Defendants that the introduction of AFFF Products to the State could disturb the State's possessory interest public lands and its natural resources, as large quantities of PFAS would and/or could be introduced into the State's air, soil, sediment, biota, surface water, estuaries, public lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State.

315.    Manufacturer Defendants' acts or omissions caused PFAS to be released into the State's natural resources, thereby contaminating, and injuring these resources. These acts or omissions wrongfully caused waste or injury to the State's lands. Moreover, at the time the

Manufacturer Defendants' acts or omissions caused the contamination, waste, and injury to the State's lands, the Manufacturer Defendants knew, or should have known, they lacked any authorization to cause, or permit to be caused, PFAS contamination, waste, and injury to the State's lands.

316.    Manufacturer Defendants thus have trespassed, and are liable for all damages from that trespass, and the State is entitled to recover all such damages and other relief.

317.    As described above, Corteva and New DuPont assumed Old DuPont's trespass liability.

318.    Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

## COUNT V
## UNJUST ENRICHMENT
## (ALL DEFENDANTS)

319.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

320.    Manufacturing Defendants marketed, sold, and distributed their AFFF Products to the State and other users in the State for profit.

321.    Manufacturing Defendants knew of the dangers that their AFFF Products posed to the State's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the State, as well as the public's health and safety.

322.    Manufacturer Defendants knew or should have known about reasonably safer and feasible alternatives to their AFFF Products but chose to maximize profit instead of adopting those alternatives.

323.    The State has conferred a benefit upon Manufacturing Defendants by incurring costs of the contamination from Manufacturing Defendants' AFFF Products, while Manufacturing Defendants have not borne those costs, thereby increasing their profits.

324.    It is unjust for Manufacturing Defendants to retain the benefits gained from forcing the State to incur costs associated with the contamination from their AFFF Products, instead of bearing that cost themselves.

325.    As described above, Corteva and New DuPont assumed Old DuPont's unjust enrichment liability.

326.    Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

## COUNT VI
## UNAUTHORIZED DISCHARGES AND DISPOSAL OF
## MUNICIPAL SOLID WASTES AND/OR INDUSTRIAL SOLID WASTES
## (ALL DEFENDANTS)

327.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

328.    Pursuant to the Texas Solid Waste Disposal Act and the implementing rules under the Texas Administrative Code, a person, without prior authorization by TCEQ, may not cause, suffer, allow, or permit the dumping or disposal of municipal solid waste or the storage, processing, or disposal of industrial solid waste. 30 TEX. ADMIN. CODE §§ 330.7(a), 15(c) and 335.2(a). Additionally, a person may not cause, suffer, allow, or permit the collection, handling, storage, transportation, processing, or disposal of municipal solid waste or industrial solid waste in such a manner that causes (1) the discharge or imminent threat of discharge of such solid waste into or adjacent to water in the state without TCEQ authorization; (2) the creation or maintenance of a

nuisance; or (3) the endangerment of human or public health and welfare or the environment. 30 TEX. ADMIN. CODE §§ 330.15(a)(1)-(3) and 335.4(1)-(3).

329.    Defendants are each a "person" as set forth in Tex. Health & Safety Code § 361.003(23).

330.    Discarded or abandoned PFAS compounds in this matter are "municipal solid waste" and/or "industrial solid waste" as defined by 30 TEX. ADMIN. CODE §§ 330.3(90), 335(92).

331.    "Disposal" includes "[t]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters." 30 TEX. ADMIN. CODE § 335(54); *see also* 30 TEX. ADMIN. CODE § 330.3(44) ("disposal" similarly defined under the Texas municipal solid waste regulations).

332.    Defendants do not have a permit, registration, or other authorization from TCEQ to "cause, suffer, allow, or permit" the disposal or discharge of PFAS in Texas. Therefore, Defendants have caused, suffered, allowed, or permitted disposal of PFAS in violation of 30 Tex. Admin Code §§ 330.7, 330.15, 335.2 and 335.4.

333.    Defendants have further caused, suffered, allowed, or permitted PFAS compounds to be disposed in a manner that has caused the discharge or imminent threat of discharge of solid waste into or adjacent to the water in the state of Texas without authorization, in violation of 30 Tex. Admin. Code §§ 330.15(a)(1), 335.4(1).

334.    Defendant have also caused, suffered, allowed, or permitted PFAS compounds to be disposed of in a manner that has caused the creation or maintenance of a nuisance, in violation of 30 Tex. Admin. Code §§ 330.15(a)(2), 335.4(2).

335. Additionally, because PFAS compounds harm human health and the environment, Defendants further caused, suffered, allowed, or permitted the disposal of PFAS in a manner that endangers the human or public health and welfare or the environment, in violation of 30 Tex. Admin Code §§ 330.15(a)(3), 335.4(3).

336. As described above, Corteva and New DuPont assumed Old DuPont's liability for this claim.

337. Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

338. For each act of violation and each day of violation of TCEQ's regulations regarding the unauthorized disposal of municipal and industrial solid waste, each Defendant is liable for a civil penalty of not less than $50 nor greater than $25,000. TEX. WATER CODE § 7.102. Each day of a continuing violation is a separate violation. *Id*. Therefore, the State asks that each Defendant be assessed a civil penalty of not less than $50 nor more than $25,000 for each day that each Defendant caused, suffered, allowed, or permitted the discharge or disposal of PFAS compounds in a manner that has violated each Texas state law described herein.

**COUNT VII**
**UNAUTHORIZED DISCHARGES INTO STATE WATERS**
**(ALL DEFENDANTS)**

339. The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

340. Pursuant to Section 26.121(a) of the Texas Water Code, except as authorized by TCEQ, no person may: (1) discharge municipal, recreational, agricultural, or industrial waste into or adjacent to any water in the State; (2) discharge other waste into or adjacent to any water in the state which may cause pollution of the water; or (3) commit any other act or engage in any other

activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state. TEX. WATER CODE § 26.121(a)(1)-(3). Furthermore, no person may cause, suffer, allow, or permit the discharge of any waste or the performance of any activity in violation of Chapter 26 of the Texas Water Code or of any permit or order of TCEQ. TEX. WATER CODE § 26.121(c).

341. Defendants are each a "person" as set forth in Tex. Water Code § 26.001(25) .

342. PFAS compounds constitute "industrial waste," "municipal waste," and/or "other waste" as defined by the Texas Water Code. *Id.* § 26.001(8), (11), (12).

343. "Waste" means "sewage, industrial waste, municipal waste, recreational waste, agricultural waste, or other waste, as defined in this section." *Id.* § 26.001(6). PFAS compounds constitute waste.

344. "Water" or "water in the state" means "groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico, inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state." *Id.* § 26.001(5).

345. "Pollution" means "the alteration of the physical, thermal, chemical, or biological quality of, or the contamination of, any water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property or to public health, safety, or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose." *Id.* § 26.001(14).

346.     "To discharge" includes "to deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release or dispose of, or to allow, permit, or suffer any of these acts or omissions." *Id.* § 26.001(20).

347.     Evidence shows the presence of PFAS in waters in the State. By marketing and selling AFFF Products that are designed to be applied to the ground, the Defendants have caused the discharge of PFAS into the environment and waters of the State.

348.     Defendants do not have a permit, registration, or other authorization from TCEQ to discharge PFAS in Texas. Therefore, Defendants have discharged PFAS in violation of Section 26.121(a)(1) and (c) of the Texas Water Code.

349.     In addition, the presence of PFAS in the waters of the State have caused and "continue[] to cause . . . pollution of" the State's waters. *See* TEX. WATER CODE §§ 26.001(14), 26.121(a)(2)-(3). By distributing AFFF owned or possessed by them that, when used as intended, releases PFAS into the State's waters, Defendants also caused and continue to cause pollution to the State's waters in violation of the Texas Water Code. *See Id.* § 26.121(a)(2)-(3).

350.     Thus, each Defendant caused, suffered, allowed, or permitted the discharge of waste into or adjacent to water in the State, in violation of Section 26.121(a)(2)-(3) of the Texas Water Code.

351.     For each act of violation and each day of violation of Chapter 26 of the Texas Water Code, each Defendant is liable for a civil penalty of not less than $50 nor greater than $25,000. TEX. WATER CODE § 7.102. Each day of a continuing violation is a separate violation. *Id.*

352.     As described above, Corteva and New DuPont assumed Old DuPont's liability for this claim.

353.    Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

## COUNT VIII
## UNAUTHORIZED AIR EMISSIONS
## (ALL DEFENDANTS)

354.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

355.    Pursuant to the Texas Clean Air Act, "except as authorized by [TCEQ], a person may not cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity that causes or contributes to, or that will cause or contribute to, air pollution." TEX. HEALTH & SAFETY CODE § 382.085(a). "A person may not cause, suffer, allow or permit the emission of any air contaminant . . . in violation of [the Health & Safety Code]." *Id.* at 382.085(b).

356.    In addition, Texas law prohibits a person from emitting "from any source whatsoever one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation, or property, or as to interfere with the normal use and enjoyment of animal life, vegetation, or property." 30 TEX. ADMIN. CODE § 101.4.

357.    Defendants are each corporations or other legal entities and are thus "persons" within the meaning of Tex. Health & Safety Code § 382.085(a) and 30 Tex. Admin. Code § 101.4.

358.    PFAS released from AFFF Products constitute "air contaminants" as defined by Tex. Health & Safety Code § 382.003(2).

359.    PFAS emissions from AFFF Products cause or contribute to "air pollution" as defined by Tex. Health & Safety Code § 382.003(3). These emissions are or may adversely affect human health and the environment. *See* 30 TEX. ADMIN. CODE § 101.4.

360.    Defendants caused, allowed, and/or permitted air pollution throughout the State by distributing AFFF owned or possessed by them that, when used as intended, releases these chemicals into the air. *See* TEX. HEALTH & SAFETY CODE § 382.085(a). Defendants also emitted contaminants by distributing AFFF owned or possessed by them that, when used as intended, emits PFAS chemicals into the air. *See* 30 TEX. ADMIN. CODE § 101.4.

361.    Pursuant to Tex. Water Code § 7.102, the State requests that each Defendant be assessed a civil penalty of not less than $50 nor more than $25,000 for each day that each Defendants caused, suffered, allowed, or permitted violations of the Texas Clean Air Act.

362.    As described above, Corteva and New DuPont assumed Old DuPont's liability for this claim.

363.    Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

**COUNT IX**
**CONTAMINATION OF PUBLIC WATER SUPPLIES AND BODIES OF WATER (ALL DEFENDANTS)**

364.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

365.    Public drinking water must be free from deleterious matter and must comply with the standards established by the TCEQ or the United States Environmental Protection Agency. TEX. HEALTH & SAFETY CODE § 341.031(a).

366.    Each public drinking water supply system shall provide an adequate and safe drinking water supply. TEX. HEALTH & SAFETY CODE § 341.0315(c).

367.    TCEQ adopted standards to implement Texas Health and Safety Code Chapter 341, Subchapter C, at Title 30, Texas Administrative Code, Chapter 290.

82

368.    Groundwater sources of drinking water shall be located so that there will be no danger of pollution from solid waste disposal sites. 30 TEX. ADMIN. CODE § 290.41(c)(1).

369.    A person may not cause, suffer, allow, or permit a violation of Texas Health and Safety Code Chapter 341, Subchapter C or a rule or order adopted thereunder. TEX. HEALTH & SAFETY CODE § 341.048(a).

370.    Defendants caused, suffered, allowed, or permitted the release and disposal of harmful PFAS compounds, creating a danger of pollution to groundwater sources of water from solid waste disposal sites and causing groundwater sources to be located near such dangers.

371.    The disposal of all liquid or solid wastes from any source on the watershed of drinking water sources must be in conformity with applicable regulations and state statutes. 30 TEX. ADMIN. CODE § 290.41(e)(1)(B). Defendants caused, suffered, allowed, or permitted the release and disposal of PFAS compounds into the watersheds of drinking water sources in violation of the regulations and statutes concerning solid waste and water quality, for example as alleged in Counts VI and VII herein, causing the contamination of such watersheds and drinking water sources.

372.    A person who causes, suffers, allows, or permits a violation under Texas Health and Safety Code Chapter 341, Subchapter C shall be assessed a civil penalty of not less than $50 and not more than $5,000 for each violation. TEX. HEALTH & SAFETY CODE § 341.048(b). Each day of a continuing violation is a separate violation. *Id.*

373.    As described above, Corteva and New DuPont assumed Old DuPont's liability for this claim.

374. Kidde Limited f/k/a Kidde plc, UTC F&S, UTC F&S Americas, UTC, Carrier Fire, Carrier Fire Americas, and Carrier are also liable for this claim due to the transactions described in paragraphs 286 through 290.

**COUNT X**
**ACTUAL FRAUDULENT TRANSFER (CHEMOURS SPINOFF) – TUFTA**
**(OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT)**

375. The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

376. Under TUFTA's actual fraudulent transfers provision, a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim. *See* TEX. BUS. & COMM. CODE § 24.005(a)(1).

377. Under TUFTA, a "creditor" is "a person who has a claim." *Id.* § 24.002(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3).

378. The State is and was a creditor of Chemours at all relevant times.

379. Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

380. The Chemours Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

381. At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

382.    Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

383.    The State has been harmed as a result of the Chemours Transfers.

384.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of reach of parties such as the State that have been damaged as a result of the actions described in this Amended Complaint.

385.    Under the Tex. Bus. & Comm. Code §§ 24.001 to 24.013 and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

386.    The State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

387.    As described above, Corteva and New DuPont apparently assumed Old DuPont's actual fraudulent transfer liability.

## COUNT XI
## CONSTRUCTIVE FRAUDULENT TRANSFER (CHEMOURS SPINOFF) – TUFTA (OLD DUPONT, CHEMOURS, NEW DUPONT, AND CORTEVA)

388.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

389.    Under TUFTA's constructive fraudulent transfer provision, a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (ii) intended to incur, or believed or reasonably should have believed that

he or she would incur, debts beyond his or her ability to pay as they became due"; or (iii) "was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." TEX. BUS. & COMM. CODE §§ 24.005(a)(2), 24.006(a).

390.     The State is and was a creditor of Chemours at all relevant times.

391.     Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

392.     Each of the Chemours Transfers and Chemours's assumption of the Assumed Liabilities was made to benefit, or for the benefit of, Old DuPont.

393.     At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

394.     Chemours made the Chemours Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

395.     Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

396.     At the time that the Chemours Transfers were made and Chemours assumed the Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

397.     The State has been harmed as a result of the Chemours Transfers.

398.    Under Tex. Bus. & Comm. Code §§ 24.001 to 24.013 and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

399.    The State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

400.    As described above, Corteva and New DuPont apparently assumed Old DuPont's constructive fraudulent transfer liability.

**COUNT XII**
**ACTUAL FRAUDULENT TRANSFER (DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA) – TUFTA**
**(OLD DUPONT, CORTEVA, AND NEW DUPONT)**

401.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

402.    The State is and was a creditor of Old DuPont at all relevant times.

403.    Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through its participation in the DowDuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

404.    The Old DuPont Transfers were made for the benefit of New DuPont and/or Corteva.

405.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

406.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors, including the State.

407.    The State has been harmed as a result of the Old DuPont Transfers.

408.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that have been damaged as a result of the actions described in this Amended Complaint.

409.    Under Tex. Bus. & Comm. Code §§ 24.001 to 24.013 and DEL. CODE tit. 6, §§ 1301 to 1312, the State is entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

410.    The State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and impose a constructive trust over such proceeds for the benefit of the State.

## COUNT XIII
## CONSTRUCTIVE VOIDABLE TRANSACTION (DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA) – TUFTA (OLD DUPONT, NEW DUPONT, AND CORTEVA)

411.    The State of Texas realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

412.    The State is and was a creditor of Old DuPont at all relevant times.

413.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

414.     Each of the Old DuPont Transfers was made to benefit, or for the benefit of, New DuPont and/or Corteva.

415.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

416.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

417.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

418.     At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

419.     The State has been harmed as a result of the Old DuPont Transfers.

420.     Under Tex. Bus. & Comm. Code §§ 24.001 to 24.013 and Del. Code tit. 6, §§ 1301 to 1312, the State is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

421.     The State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and impose a constructive trust over such proceeds for the benefit of the State.

## V.     TRIAL BY JURY

422.     The State herein requests a jury trial and tenders the jury fee to the District Clerk's office as required by Tex. R. Civ. P. 216 and Tex. Gov't Code § 51.604.

## VI.     REQUEST FOR RELIEF

WHEREFORE, the State asks that this Court:

423.     Find Defendants liable for all costs to investigate, test, clean up and remove, restore, treat, monitor, and for such orders as may be necessary to provide full relief to address the threat of contamination to the State, including the costs of:

    i.     Past and future testing of natural resources at and around the sites throughout Texas where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and disposed and, thus, likely caused PFAS contamination;

    ii.    Past and future treatment of all natural resources at and around the sites throughout Texas where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and disposed and which contain detectable levels of PFAS until restored to non-detectable levels;

    iii.    Past and future monitoring of the State's natural resources at and around the sites throughout Texas where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and disposed as long as there is a detectable presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

    iv.    Providing water from an alternate sources;

    v.    Installing and maintaining wellhead treatments;

    vi.    Installing and maintaining wellhead protection programs;

    vii.    Installing and maintaining an early warning system to detect PFAS before it reaches wells;

viii.    Outreach, education, community engagement, and additional public health studies, assessments, and measures;

ix.    Implementing biomonitoring programs for water, soil, air, and all other impacted environmental media in communities and other areas where surface water and groundwater sources have become contaminated by PFAS;

x.    Collecting and safely disposing of existing AFFF from sites around the State;

xi.    Designing, implementing, and operating biomonitoring programs and studies and costs to otherwise assess PFAS public health impacts for all residents of the State; and

xii.    Otherwise responding to PFAS contamination resulting from Manufacturer Defendants' AFFF Products so the contaminated natural resources are restored to their original condition, or are replaced by reasonably equivalent resources;

424.    Order Defendants to pay all damages to compensate the residents of the State for the lost use and value, including loss of tax revenue of and other economic benefits from these natural resources during all times of injury caused by PFAS;

425.    Order Defendants to pay for all costs related to the collection, return, and/or disposal of existing stocks of Manufacturer Defendants' AFFF Products;

426.    Order past and future investigation, assessment, testing, treatment, and remediation of all AFFF-related contamination at sites where Manufacturer Defendants' AFFF Products were used and which contain detectable levels of PFAS restored to nondetectable levels, including the State's oversight costs;

427.     Order future monitoring of the sites and the State's natural resources where Manufacturer Defendants' AFFF Products were used as long as there is a detectable presence of PFAS and restoration of such natural resources to their pre-contamination condition, including the State's employees' time and associated costs;

428.     Order Defendants to pay for all other damages sustained by the State in its sovereign, *parens patriae*, public trustee, landowner, and other capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

429.     Order Defendants to reimburse the State for its costs of responding to PFAS contamination, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources, including the State's oversight costs, resulting from Manufacturer Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition;

430.     Order Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination of the State's natural resources, including the State's oversight costs, resulting from Manufacturer Defendants' AFFF Products so that such natural resources are remediated and restored to their original condition;

431.     Order Defendants to reimburse the State for its costs of abatement of the public nuisance, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources at and around the sites throughout the State where Manufacturer Defendants' AFFF Products were transported, stored, used, handled, released, spilled, and disposed so that such natural resources are restored to their original condition;

432.    Compel Defendants to pay special damages to the State for public nuisance, funding its performance of any further assessment and compensatory restoration of any natural resource that has been, or may be, injured as a result of the transport, storage, use, handling, release, spilling, and/or disposal of Manufacturer Defendants' AFFF Products and compelling Defendants to compensate the citizens of the State for the costs of restoration and replacement, including lost use and value of any injured natural resource;

433.    Find and declare that the State has conferred a benefit onto Defendants in the form of costs incurred responding to PFAS contamination resulting from Manufacturer Defendants' AFFF Products, and that Defendants have been unjustly enriched by its practice of externalizing the costs associated with PFAS contamination onto the State;

434.    Order Defendants to pay restitution to the State;

435.    Order Defendants to disgorge all ill-gotten gains;

436.    Order Defendants to pay exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a);

437.    Order Defendants to pay civil penalties pursuant to the Texas Water Code § 7.102.

438.    Void the Chemours Transfers and recover property and value transferred to Old DuPont;

439.    Void the Old DuPont Transfers and recover property and value transferred to New DuPont;

440.    Void the Old DuPont Transfers and recover property and value transferred to Corteva;

441.    Enjoin New DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

442.    Enjoin Corteva, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

443.    Impose a constructive trust over the proceeds of the Chemours Transfers to Old DuPont for the benefit of the State;

444.    Impose a constructive trust over the proceeds of the Old DuPont Transfers to New DuPont for the benefit of the State;

445.    Impose a constructive trust over the proceeds of the Old DuPont Transfers to Corteva for the benefit of the State;

446.    Award the State punitive damages in an amount to be determined by the trier of fact;

447.    Award the State costs and fees in this action, including reasonable attorneys' fees incurred in prosecuting this action pursuant to Tex. Gov't Code § 402.006(c) and Tex. Water Code § 7.107, the State's investigation costs together with prejudgment interest, and post-judgment interest pursuant to Tex. Fin. Code § 304.003, to the full extent permitted by law;

448.    Enjoin Defendants from further actions that will damage the State through the use, manufacturing, or sale of PFAS in any way; and

449.    Award the State such other relief as this Court deems just and proper.

Dated: November 20, 2024.                    Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**KELLIE BILLINGS-RAY**
Chief, Environmental Protection Division

*/s/ Katie B. Hobson*
**KATIE B. HOBSON**
State Bar No. 24082680
**BRITTANY WRIGHT**
State Bar No. 2413001
Assistant Attorneys General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Telephone: (512) 463-2012
Facsimile: (512) 320-0911
Katie.Hobson@oag.texas.gov
Brittany.Wright@oag.texas.gov

*/s/ Lauren H. Shah*
**WILLIAM J. JACKSON**
**JOHN D.S. GILMOUR**
**JENNIFER C. BARKS**
**LAUREN H. SHAH**
**MARIA F. PIMIENTA**
**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd., Suite 900
Houston, TX 77027
Telephone: (713) 355-5000
Facsimile: (713) 355-5001
bjackson@kelleydrye.com
jgilmour@kelleydrye.com
jbarks@kelleydrye.com
lshah@kelleydrye.com
mpimienta@kelleydrye.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served on all counsel of record.

Dated: November 20, 2024                              */s/ Lauren H. Shah*
                                                      Lauren H. Shah